**TRANSPORT EQUIPMENT COMPANY,**
**Plaintiff-Appellee,**

v.

**GUARANTY STATE BANK,**
**Defendant-Appellant.**

**No. 74–1747.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 23, 1975.

Decided June 26, 1975.

Ronald C. Newman, Kansas City, Kan. (Leonard O. Thomas, Kansas City, Kan., on the brief), for plaintiff-appellee.

Charles D. Kugler, Kansas City, Kan., for defendant-appellant.

Before MURRAH, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Guaranty State Bank (Bank) appeals from the judgment of the Trial Court in favor of Transport Equipment Company (TECO) and its award of damages in sum of $11,300.00.

During the period from August to November, 1970, TECO sold, on open account, a number of truck body kits to Western Equipment Company (Western), a small corporation engaged in the business of constructing truck platforms and truck bodies and assembling prefab aluminum body kits. Of these kits sold to Western, a number had been resold by Western without payment to TECO, while certain others—those eight kits presently in dispute—remained on Western's premises in March of 1971. Having determined in early 1971 that Western's financial condition was deteriorating, TECO, on March 16, 1971, entered into a new arrangement with Western's president, Robert Fick. First, TECO accepted a promissory note from Western for those body kits which had been resold without payment to TECO. The remaining eight body kits still on Western's premises were sold back to TECO and

consigned to Western under an agreement which gave TECO a security interest in the unsold kits. TECO filed a financing statement listing these eight truck body kits with the Secretary of State on March 22, 1971, at 1:57 p. m.

During 1970, Bank loaned money to Western in the sum of $3,000.00 evidenced by a promissory note which came due and was renewed on January 8, 1971. On January 18, 1971, Bank filed a financing statement which, in part, specifically listed several of the eight body kits described above. No separate written security agreement was entered into between Bank and Western.

On February 11, 1971, and March 8, 1971, Lien Notices were filed by the IRS evidencing assessments for delinquent taxes owing by Western.

Seizure of Western's physical assets occurred on March 23, 1971. Some time prior to the date of the seizure a check was made by IRS personnel for financing statements filed with the Secretary of State, having priority to the IRS claims. This check revealed the existence of Bank's financing statement and Bank, along with other creditors, was notified by IRS Agent Baum of the impending seizure and advised to remove all the assets in which it claimed an interest. TECO's financing statement had not then been filed and it was not notified.

Bank thereafter took action to remove the assets in which it claimed an interest—including the eight body kits now in dispute—on March 22, and 23, 1971.

Following seizure, the IRS sold Western's remaining assets by public auction on April 19, 1971. Purchaser at that sale was one H. L. Sandifer. On that same date, Sandifer purchased by private sale those assets of Western in the possession of Bank.

In its Memorandum Opinion filed March 18, 1974, the Trial Court concluded that Bank's security interest in the goods in question was subordinate to TECO's, and that in selling the goods without prior notice to TECO, Bank had not conducted a commercially reasonable sale pursuant to K.S.A. 84–9–504 and was liable for damages under K.S.A. 84–9–507 in the sum of $11,300.00, the fair market value of the goods.

On appeal Bank contends: (1) that the arrangement entered between TECO and Western on March 16, 1971, was in violation of the Kansas bulk sales statutes; (2) that the Trial Court erred in holding TECO's security interest to have priority; and (3) that the Trial Court erred in computing the damages awarded.

I.

Bank contends that the sale and consignment back transaction entered into between TECO and Western—without notice to other creditors—on March 16, 1971, amounted to a bulk transfer in violation of K.S.A. 84–6–101 et seq.

The Trial Court in its Memorandum Opinion filed March 18, 1974, held that this was an issue as to which no evidence had been introduced at trial and was not, therefore, properly before it. It further held that in any event this transfer was one "made to give security for the performance of an obligation" and was hence excepted from coverage under K.S.A. 84–6–103(1). We agree.

We reject Bank's unsupported contention that the exception under K.S.A. 84–6–103(1) "could only be meant to apply to those transfers wherein a security agreement *denoted as such* is drawn and signed." *See,* U.C.C. Official Comment 2 to § 6–103; Mann v. Clark Oil & Refining Corporation, 302 F.Supp. 1376 (E.D. Mo.1969), aff'd 425 F.2d 736 (8th Cir. 1970); 40 A.L.R. 3d 1078 p. 1103 et seq. The consignment agreement provided in part:

In consideration of the mutual promises hereinafter contained, the parties agree as follows:

1. Security Interest. Western grants to TECO to the extent it has capacity to do so a security interest in the consigned goods for the purpose of securing unto TECO the

payment of any and all indebtedness, liabilities and obligations of Western to TECO whether now due or hereafter arising.

(TR. Vol. II, p. 334).

It is clear that the purpose of this consignment agreement was to secure payment for the body kits delivered to Western out of the proceeds of the sale of those kits. The consignment was made to give security and falls clearly within the exception of K.S.A. 84–6–103. *See,* Mann v. Clark Oil & Refining Corporation, *supra.*

## II.

■ Bank alleges that the Trial Court erred in finding TECO's security interest to have priority, contending either: (1) that it was unnecessary for Bank to obtain a written security agreement from Western since its financing statement fulfilled the requirements of K.S.A. 84–9–203[1]; or (2) that its interest was perfected, pursuant to K.S.A. 84–9–304, 305, by virtue of its taking *possession* of the collateral prior to the time TECO filed with the Secretary of State on March 22, 1971.

In Mitchell v. Shepherd Mall State Bank, 458 F.2d 700 (10th Cir. 1972), we rejected the contention that a financing statement such as the one here could substitute as a security agreement. In interpreting statutory language identical to K.S.A. 84–9–203, Judge Murrah, for the court, stated:

Cases and treatises construing these two sections have almost uniformly come to the conclusion that in order for a security agreement to be effective *it must contain language which specifically creates or grants a security interest* in the collateral described.

\* \* \* \* \* \*

The function of a financing statement is to put third parties on notice that the secured party who has filed it may have a perfected security interest in the described collateral . . . . *Absent language which would constitute the debtor's grant of a security interest,* a financing statement cannot serve as a security agreement. (Emphasis supplied).

458 F.2d 700 at 703, 704.

See *also,* Shelton v. Erwin, 472 F.2d 1118 (8th Cir. 1972). Our review of the financing statements filed by the Bank in the instant case reveals no such "granting" language.

In regard to Bank's alternative theory—that it perfected its security interest in the collateral by taking possession prior to the time TECO filed with the Secretary of State—there exists a conflict in the record as to the time sequence of events occurring on March 22 and 23. Bank contends that its agents arrived at Western's business premises some time during the morning of March 22; that they had begun loading the collateral onto either a rented truck or one belonging to the debtor prior to the time that TECO filed at 1:57 that afternoon; and that even if the Court's finding that Bank had not begun loading equipment until the rented truck arrived after 3:24 p. m. is found to be supported by the evidence, the continuous presence of the Bank employees on the debtor's premises commencing in the morning of March 22, constituted "possession" sufficient to satisfy K.S.A. 84–9–305.[2]

---

1. K.S.A. 84–9–203 provides, inter alia:

Enforceability of security interest; proceeds, formal requisites. (1) . . . a security interest is not enforceable against the debtor or third parties unless

\* \* \* \* \* \*

(b) the debtor has signed a security agreement which contains a description of the collateral . . . .

2. K.S.A. 84–9–305 provides, inter alia:

When possession by secured party perfects security interest without filing. A security interest in . . . goods . . . may be perfected by the secured party's taking possession of the collateral.

After a careful review of the entire record we are convinced that there is ample evidence supporting the Trial Court's determination that Bank had not begun *loading* the collateral until after the arrival of the rented truck, i. e., some time after 3:24 p. m., on March 22.

■ The remaining question, then, is whether Bank entered into "possession" of the collateral by virtue of the fact that its employees were present on the debtor's premises during the morning of March 22. Bank contends that "mere physical presence in the debtor's premises is sufficient to satisfy the requirement of actual possession." We disagree.

In In Re Automated Bookbinding Services, Inc., 471 F.2d 546 (4th Cir. 1972), the Court noted:

"Possession" is one of the few terms employed by the Code for which it provides no definition. The Code's general purpose is to create a precise guide for commercial transactions under which businessmen may predict with confidence the results of their dealings. In defining "possession" we must be guided by these considerations as well as by the underlying theories unique to Article 9. . . . "Possession" is used throughout Article 9 in establishing the filing scheme . . and in providing perfection through means other than filing, such as through the secured party's taking possession. *The ostensible ownership exercised through possession is demonstrated through simple physical control.* One who controls the collateral possesses it, and *leads others to believe it is his.*

\*    \*    \*    \*    \*    \*

Pre-code security law defined possession as meaning physical control.

\*    \*    \*    \*    \*    \*

Perhaps the secured party *must take possession* from the debtor, who has possession, in order *to demonstrate the ostensible ownership* which indicates the perfected security interest *to other potential creditors.* (Emphasis Supplied).

471 F.2d 546 at 551, 552, 553, 554.

Pre-code law required as open and notorious a change of possession as the nature of the property permitted in order to give plain and public notice to other creditors or purchasers of the secured party's claim against the property. 53 A.L.R.2d 936; 79 A.L.R. 1018. There is no indication that the pre-code definition of possession has been modified. *See,* U.C.C. Official Comments to § 9–305; 68 Am.Jur.2d, *Secured Transactions* § 73; Lee, *Perfection and Priorities Under the Uniform Commercial Code,* 17 Wyo.L.J. 1 (1963).

In light of the nature of this collateral—it was movable and capable of being loaded on trucks—the mere presence of Bank's employees on Western's premises, standing alone, would not, we believe, be sufficient to satisfy the requirement that notice be given to other creditors of Bank's claimed interest in this collateral.[3]

■ We find appropriate the following rule cited with approval by the Court in In Re Westbrook, 228 F.Supp. 966 (E.D.Ark.1964), aff'd 337 F.2d 404 (8th Cir. 1964):

The possession of the mortgagee in order to be sufficient notice to dispense with record must be *unequivocal, absolute and notorious,* so that third persons may be advised. Symbolical possession only, as by the parties walking around the property and agreeing that it shall henceforward be regarded as in possession of the mortgagee . . is not sufficient. [Citing Hughes, Ar-

---

**3.** In so holding, we note that this is not a case where the evidence indicates that the debtor's premises were locked and the secured party was in possession of the key; that the secured creditor had made substantial progress in dismantling, loading and removing the collateral; or that the secured creditor had taken other affirmative action evidencing his control over the collateral. Hence we find inapposite Stanley v. Fabricators, Inc., 459 P.2d 467 (Alaska 1969), and other authorities relied upon by Bank.

kansas Mortgages § 142, p. 117 (1930)]. 228 F.Supp. 966 at 968.

Finally, Bank contends that it "perfected" its security interest by *filing* and that while by taking possession of the collateral its interest became "enforceable"—and presumably "attached" for purposes of K.S.A. 84–9–312(5)(a)—"possession" was not a necessary step towards perfection. Hence, it argues, its priority must be determined under the "first to file" rule of K.S.A. 84–9–312(5)(a), citing First National Bank and Trust Company of Vinita, Oklahoma v. Atlas Credit Corporation, 417 F.2d 1081 (10th Cir. 1969). This novel argument is made without citation of cogent authority and is, in our opinion, erroneous and confuses the issue.

Prior to Bank's taking possession it had no security interest in the collateral. *See,* Shelton v. Erwin, *supra.* Its filing of a financing statement was without legal effect and any rights it later acquired were in no way dependent upon the existence of the financing statement. Bank obtained an enforceable security interest by the act of taking possession, K.S.A. 84–9–203(1)(a). By that same act its security interest was perfected. K.S.A. 84–9–305. This section further provides that there can be no *relation back* of the perfection date when perfection is obtained through possession.

■ While Bank contends that possession was not a "necessary step" toward the perfection of its security interest, we note that under K.S.A. 84–9–303 and K.S.A. 84–9–312(5)(a) a security interest cannot be considered "perfected", even by filing, unless at some point in time (and under 84–9–312(5)(a) this may occur *after* filing) the security interest does in fact "attach". Prior to the time that the Bank *took possession,* its security interest *had not attached* (K.S.A. 84–9–204),

since the mere existence of the financing statement did not itself create a security interest.[4] *See,* Shelton v. Erwin, *supra.* Hence, we believe, possession by Bank fulfilled the "necessary step" toward perfection of attaching the security interest to the collateral.

The code establishes two basic methods for perfecting a security interest: filing and possession. Those sections dealing with enforceability and perfection in cases where the secured party has taken possession were intended, as we see it, to cover all situations where the parties' security interest arose through possession rather than through the execution of a security agreement.

■ Bank may not combine elements of perfecting under the filing method with elements under the possession method to defeat the non-retroactivity rule of K.S.A. 84–9–305.

We hold that the Trial Court did not err in finding that Bank had not perfected its security interest by taking possession of the collateral prior to TECO's filing at 1:57 p. m. on March 22.

### III.

In assessing damages under K.S.A. 84–9–507 the Trial Court determined that the fair market value of the goods was $11,300.00, relying upon Kelly v. McCarty, 75 Kan. 818, 88 P. 882 (1907). This amount reflected the *retail* value of the body kits—i. e., the value of the kits if they were completely assembled and installed on a truck—as testified to by Aubrey C. Davis, an officer of TECO.

Bank contends that the Trial Court erred in computing these damages by ignoring: (1) that the wholesale value of these goods—the price for which they were originally sold to Western—was

4. If the secured creditor is not in possession, it has been held that the "agreement" under 9–204 must be in writing. *See,* 69 Am.Jur.2d Secured Transactions § 339. Since Bank was not in possession on March 22 and 23 of 1971, and since it had no security agreement or writ-

ten agreement sufficient to satisfy K.S.A. 84–9–204, we must presume that if its security interest "attached" at all—a "necessary step" under K.S.A. 84–9–303 to perfection—it attached only when it took possession of the collateral.

$6,409.70; (2) that the evidence indicates that these kits were not completely assembled; (3) that TECO's witness Davis testified that a considerable expense would be involved in any effort TECO might have taken to salvage these kits; and (4) that, except for the intervening action of Bank, the I.R.S. would have seized and sold these goods and that TECO would have had to "outbid" Sandifer at the public auction to retrieve them.

In its Order of May 2, 1974, denying Bank's motion for a new trial, the Trial Court stated:

> The defendant further contends that the court erred in awarding plaintiff damages in the sum of $11,300. It is defendant's position that, but for its sale of the goods, plaintiff would have had to expend a considerable sum to take possession of the goods and resell them and also would have had to satisfy the lien of the Internal Revenue Service, which amounts should diminish plaintiff's recovery. *Without speculating as to what might have been, the unrefuted testimony of Mr. Davis . . . was that the retail value of the truck body kits at the time of their sale by the defendant was $11,300.* We have previously determined this to be the fair market value of the goods, and we now affirm that determination. (Emphasis supplied).

■ Findings of the Trial Court must be upheld unless clearly erroneous, Rule 52, Fed.R.Civ.P., 28 U.S.C. It is not the function of the Court of Appeals to infer material facts. Hodgson v. Okada, 472 F.2d 965 (10th Cir. 1973). Nor may the appellate court make a controlling inference which the Trial Court has not made and which, if done, would in effect constitute a trial de novo. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129

(1969). Where different inferences may be drawn, appellate courts will not substitute their judgment for that of the Trial Court. Colby v. Cities Service Oil Company, 254 F.2d 665 (10th Cir. 1958).

Nevertheless, we have held that inferences may be drawn only from facts in evidence and may not be based upon mere speculation, guess or conjecture. *Hodgson v. Okada, supra;* Tyrrell v. Dobbs Investment Co., 337 F.2d 761 (10th Cir. 1964); Waters v. National Life & Accident Ins. Co., 156 F.2d 470 (10th Cir. 1946). In determining that the market value of these goods "at the time of their sale" equaled their retail value the Trial Court had to infer that all eight kits were at that time completely assembled and ready to be installed. Our review of the evidence indicates that this inference is not supported by the facts.

■ The Trial Court was correct in observing that the testimony of Mr. Davis was "unrefuted" as to the "retail value" of these body kits. The Court erred, however, by inferring that this amount represented their value *at the time of their sale.* While Davis testified that the bodies he saw on Western's premises on May 5, 1971, "were assembled", this was over two weeks after the sale. Further, each witness who had occasion to see the goods between the time they were picked up by Bank and the time they were sold—including the purchaser, Sandifer [5]—testified that at most, several of the body kits were partially assembled at that time.

■ We agree with the Trial Court that in assessing damages it need not consider purely speculative matters such as what action the I.R.S. might or might not have taken had Bank not intervened. Evidence existed, however, that at the time of sale these goods were not, in fact, in a condition to be sold retail. Their value should, accordingly, have

---

5. Sandifer testified on cross-examination:

. . . what the bank had wasn't any good without the stuff at the [IRS] auction. When they had separated the two, one wasn't much good without the other, because part of

the components it took to put the bodies back together, IRS had their stamp on . . . it took the two to make a package deal to be of any value to anybody. (TR. Vol. 1 at 111).

been discounted. This is not a case where "there are no adequate records which permit anyone to compute, with any degree of certainty at all, the amount of [damage]." *Compare* Hodgson v. Okada, *supra.* TECO's witness Davis testified that the value of these goods in a partially assembled state or with parts misplaced or missing could have been judged:

It would be based on what the item would sell for in its completed state . . . less whatever items may be missing. (TR Vol. I. pp. 216–217).

■ The burden of proof as to the *commercial reasonableness* of a sale is generally placed upon the secured party conducting the sale, e. g., where the secured party is seeking a deficiency judgment. 59 A.L.R.3d 369. However, where, as here, a party is proceeding against the secured party to recover his loss caused by a failure to proceed pursuant to the code, he should carry the burden of proving the amount of that loss. Vic Hansen & Sons, Inc. v. Crowley, 57 Wis.2d 106, 203 N.W.2d 728, 59 A.L.R.3d 360.

TECO did not meet this burden. TECO's evidence of the retail value of these goods was not the proper market value measure inasmuch as they were not, in fact, in an "assembled" condition when sold.

In light of our holding that damages equal to the retail value of fully assembled body kits does not reflect the fair market value of these goods at the time of sale, we remand to the Trial Court for further proceedings determinative of the market value of the goods at the time of sale, and for such other action deemed necessary by the Trial Court consistent with this opinion.

Affirmed in part and remanded with instructions.