**In the Matter of O.P.M. LEASING SERVICES, INC., Debtor.**

**James P. HASSETT, as Trustee of O.P. M. Leasing Services, Inc., Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF GREATER NEW YORK, Defendant.**

Bankruptcy No. 81 B 10533.
Adv. No. 83–5333A.

United States Bankruptcy Court, S.D. New York.

Feb. 27, 1985.

Zalkin, Rodin & Goodman, New York City, for Trustee; Richard Toder and Lawrence Henin, New York City, of counsel.

Ellen Barrett Levin, New York City, for Blue Cross and Blue Shield of Greater New York; John Colucci, New York City, of counsel.

BURTON R. LIFLAND, Bankruptcy Judge.

This matter is before the Court on the Motion of James P. Hassett, the Trustee ("the Trustee") of O.P.M. Leasing Services, Inc. ("OPM") for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Bankruptcy Rule 7056 to recover the sum of $122,121.38, plus interest thereon, from the defendant Blue Cross and Blue Shield of Greater New York ("BCBS").[1] BCBS has cross-moved for summary judgment dismissing the Trustee's claim and for related relief. The instant adversary proceeding within this Chapter 11 case concerns an escrow agreement between OPM and BCBS under which BCBS received $122,121.38 on February 13, 1981. The issue presented is whether the release of this money was a transfer of property of the debtor which the Trustee can avoid under §§ 547 and 544 of the Bankruptcy Reform Act of 1978 ("the Code").

## I. Statement of Facts

OPM, the debtor herein, is engaged in the business of buying, selling and leasing new and used computers and related equipment. On March 11, 1981, OPM filed a voluntary petition for reorganization under Chapter 11 of the Code. Pursuant to 11 U.S.C. § 151104,[2] the reorganization Trustee was appointed on March 27, 1982.

On or about October 5, 1976, Dav-Na Associates ("Dav-Na"), a general partnership of Myron S. Goodman and Mordecai Weissman, the principals of OPM, entered into a lease agreement (the "Lease") with BCBS whereby Dav-Na agreed to lease certain computer and related equipment to

---

1. The Trustee's summary judgment motion includes a request for a declaration that BCBS' alleged security interest in certain computer equipment is void. BCBS acknowledges that it failed to perfect its security interest, which is the subject of its counterclaim, until after OPM's bankruptcy petition was filed. Accordingly the counterclaim shall be dismissed.

2. Code § 151104 provides in relevant part:
 (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

 (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
 (2) if such appointment is in the interests of creditors, any security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

BCBS for a period of 90 months. Section 17 of the Lease gave BCBS the right to terminate the lease at any time after 48 rental payments had been made, upon 120 days prior written notice, which notice could be given at any time after 44 monthly rental payments had been made ("the early termination option").[3] In the event that BCBS elected to exercise the early termination option, BCBS would become obligated to pay Dav-Na a specified percentage of the original purchase price of the leased equipment ("the termination payment"), as set forth in the Schedule of Termination Values, annexed to the Lease.

Dav-Na was obligated, upon receipt of the termination payment, to pay BCBS an amount equal to the termination payment plus interest thereon at the rate of 12 percent per annum accruing from the date of payment to the date of reimbursement ("the reimbursement agreement"). If Dav-Na failed to reimburse BCBS for the amount of the termination payment, BCBS was entitled, to the extent permitted by law, to take possession of and sell the equipment to satisfy Dav-Na's reimbursement obligation.

Simultaneously with the execution of the Lease, Dav-Na and BCBS entered into an escrow agreement ("the escrow agreement") to provide BCBS with security for the performance by Dav-Na of its reimbursement obligation. In accordance with the escrow agreement, Dav-Na deposited with Singer, Hutner, Levine & Seeman,

Esqs., attorneys for OPM ("the Escrow Agent"), the sum of $100,000 ("the escrow deposit"). The Escrow Agent was immediately obligated to place the escrow deposit in an interest bearing account with a federally insured banking institution in New York City, and to deliver to Dav-Na all interest earned on the escrow deposit. Section 4 of the escrow agreement required the Escrow Agent, upon written notice from BCBS that Dav-Na had defaulted in performing its reimbursement obligation, to release to BCBS that portion of the escrow deposit and any interest therein equal to the default amount. There is nothing in the record to indicate that Dav-Na or its successor ever received any earned interest. Conversely and as shall be shown hereinafter the release to BCBS included accrued interest.

On or about December 23, 1976, in accordance with section 5.3(i) of the Lease, Dav-Na assigned all of its right, title and interest in the Lease to OPM, and OPM assumed all of Dav-Na's obligations under the Lease. On the same day, the escrow agreement was similarly assigned and assumed. OPM subsequently assigned all of its right, title and interest in the Lease, including rental payments due thereunder, to Citicorp Industrial Credit Corporation ("Citicorp").

After having made 44 monthly rental payments, on or about July 18, 1980, BCBS provided written notice of its intent to exer-

---

**3.** The willingness of Weissman and Goodman to offer Early Termination Options was one of the main reasons for OPM's spectacular growth. The idea of offering early termination options was implemented when Weissman and Goodman realized that by lengthening the duration of leases they could offer lease rates below their competition and yet structure transactions to yield positive cash flow. Unfortunately, potential lessees resisted longer lease terms. The solution to lessees' reluctance to extend lease duration was to offer them options to terminate their leases before expiration of the full lease terms.

These Early Termination Options created serious financial risks for OPM. A léssee's exercise of an Early Termination right often indicated that the market value of the leased equipment had dropped below the monthly rental. OPM could remarket the equipment, but the resulting rentals usually fell well short of the level in the original lease. Under these circumstances, OPM's original lease, which yielded a positive cash flow, turned out to be a financial disaster. Most other leasing companies were unwilling to undertake this financial risk. Those other computing leasing companies that offered Early Termination clauses protected themselves against the risk by purchasing insurance. OPM never obtained similar insurance. Without the expense of insurance premiums, OPM enjoyed a slight cost advantage over its competitors. However, without this protection, OPM bore the full risk of equipment obsolescence. OPM's gamble proved disastrous. Report of the Trustee Concerning Fraud and Other Misconduct in the Management of the Affairs of the Debtor at 22.

cise the early termination option of the lease. On or about December 31, 1980, after 48 monthly rental payments had been made, and in accordance with the Schedule of Termination Values, BCBS paid Citicorp $2,594,683.10, representing 53.5% of the original purchase price of the leased equipment. OPM subsequently defaulted on its reimbursement obligation. On February 13, 1981, within the 90-day voidable preference period of Code § 547, the escrow agent caused $122,121.38, the amount of the escrow deposit plus interest thereon, to be released to BCBS.

The Trustee commenced this adversary proceeding on March 16, 1983 seeking to recover the money transferred from the escrow account, plus interest, as a preferential transfer under § 547 of the Code. The Trustee has moved for summary judgment on this claim. He asserts that a preferential transfer occurred when the Escrow Agent transferred the funds in the escrow account to BCBS within weeks of OPM's bankruptcy filing. The basis of his claim is that OPM retained a legal interest in the escrow account which constituted property of the estate within the meaning of Code § 541.

Alternatively, the Trustee seeks to utilize the "strong-arm" provisions of Code § 544(a) to defeat BCBS' rights in the escrow account. The Trustee argues that the terms of the escrow agreement between OPM and BCBS created a security interest in the escrow account which BCBS failed to perfect, as required by Article 9 of New York Uniform Commercial Code ("N.Y.U.C.C."). Consequently, urges the Trustee, BCBS' unperfected interest in the account is subordinate to the interest of a subsequent lien creditor, or a trustee in bankruptcy, and it can be recovered.

BCBS has cross-moved for summary judgment, seeking dismissal of the Trustee's complaint. BCBS asserts that the Trustee has not established the first element of a preferential transfer under § 547 of the Code, because the release of the escrow deposit was not a transfer of OPM's property. Rather, BCBS contends that the transfer from OPM took place in 1976 when the escrow account was first created. Thus, according to BCBS, the transfer which took place in February 1981 was not a transfer of property of the debtor within the meaning of § 547(e).

Next, BCBS seeks to refute the necessity of filing a U.C.C. financing statement to perfect its security interest in the escrow account, on two alternative grounds. First, BCBS asserts that the escrow account, as a deposit account, is exempt from the provisions of Article 9. Second, BCBS argues that it effectively perfected its security interest prior to the bankruptcy filing by taking possession of the escrowed funds, thereby defeating the Trustee's strong-arm powers.

Thus, the two issues for decision raised by the various arguments are as follows:

(1) Whether the transfer by the Escrow Agent to BCBS within the 90 day preference period constituted a transfer of property of the debtor within the meaning of Code § 547(e).

(2) Whether the escrow account constituted an unperfected security interest in the escrowed funds, which the Trustee may avoid by virtue of his strong-arm powers, pursuant to Code § 544(a).

For the following reasons, this Court holds that the release of the escrow deposit to BCBS on February 13, 1981 was neither a preferential transfer of property of OPM nor a transfer which may be avoided pursuant to the Trustee's strong-arm powers. The Trustee's motion for summary judgment is denied, and BCBS' cross-motion for summary judgment is granted.

## II. *Discussion of Law*

### A. *Summary Judgment*

■ Summary judgment is appropriate where the movant demonstrates the lack of any genuine issues of material fact to be tried. *Burtnieks v. City of New York,* 716 F.2d 982, 985 (2d Cir.1983). The mere assertion by both parties that summary judgment is appropriate does not warrant the granting of summary judgment unless one

of the moving parties is entitled to judgment as a matter of law. *Schwabenbaur v. Board of Education,* 667 F.2d 305, 313 (2d Cir.1981); *Home Insurance Co. v. Aetna Casualty and Surety Co.* 528 F.2d 1388, 1390 (2d Cir.1976); *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975).

Because there are no genuine issues of material fact in dispute, this case is ripe for summary judgment.

### B. *The Transfer Was Not A Preference*

 To establish an avoidable preference, the Trustee must prove by a preponderance of the evidence the following elements, as set forth in Code section 547(b):

 (i) a transfer of property of the debtor;

 (ii) to or for the benefit of a creditor;

 (iii) for or on account of an antecedent debt;

 (iv) made while the debtor was insolvent;

 (v) made on or within 90 days before the date of filing of the petition;

 (vi) that enables such creditor to receive more than it would receive in a Chapter 7 liquidation if the transfer had not been made.

11 U.S.C. § 547(b). *See In re Kennesaw Mint, Inc.,* 32 B.R. 799, 803 (Bankr.N.D.Ga. 1983); *Matter of Richter & Phillips Jewelers & Distributors, Inc.,* 31 B.R. 512, 514 (Bankr.S.D.Ohio 1983); *In re Gruber Bottling Works, Inc.,* 16 B.R. 348, 351 (Bankr. E.D.Penn.1982). The Trustee is not entitled to recover if any one of these elements is insufficiently demonstrated. *See In re Cosmopolitan Aviation Corp.,* 34 B.R. 592, 596 (Bankr.E.D.N.Y.1983); *In re R. Purbeck & Associates, Ltd.,* 27 B.R. 953, 955 (Bankr.D.Conn.1983). *In re Kelly,* 3 B.R. 651, 653 (Bankr.E.D.Tenn.1980).

Section 547(e)(1) defines "transfer" for the purposes of § 547(b). It states:

 For purposes of this section—

 . . . . .

 (B) a transfer of ... property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

*Id.*

The key, therefore, to determining when the transfer of OPM's proprietary interest in the escrow account occurred is whether under New York law a judgment lien creditor of the depositor could acquire an interest greater than the beneficiary of the escrow by attachment of the escrow account.

Section 5201(b) of New York Civil Practice Law & Rules ("N.Y.CPLR") sets forth the general rule regarding the types of property subject to a judgment creditor's lien. It states in pertinent part:

 A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment....

N.Y.Civ.Prac.R. 5201(b) (McKinney 1964).

The official commentary to this section specifically addresses the issue of whether a judgment creditor can reach property placed in an escrow account by a judgment debtor. It states:

 [T]he judgment creditor's ... right to a given item of property is deemed coextensive with ... the judgment debtor's ... own interest in it. The theory is that the judgment creditor steps into the shoes of the judgment debtor. If the item is subject to any outstanding commitment honestly incurred (i.e., without fraud on creditors), the judgment creditor is bound by it and can assert an interest in the item only to the extent that an interest remains after the commitment is subtracted. If the item is subject to a ... contractual obligation ... and the same is binding on the judgment debtor, it binds the judgment creditor as well.

In *Valerio v. College Point Savings Bank,* 48 Misc.2d 91, 264 N.Y.S.2d 343 (Sup.Ct. Suffolk Co.1965), for example, the judgment creditor tried to reach certain escrow moneys held by a bank to cover taxes and assessments against the

debtor's property.... The moneys were held pursuant to the usual mortgage agreement ... and there was no evidence of any fraudulent activity. The court held the escrow moneys unavailable to the judgment creditor.

Measured by the rule set forth above, the same result is reached by noting that since the judgment debtor is bound by the agreement and thus unable to reach the escrow moneys, the judgment creditor's rights are similarly restricted. The debtor's shoes do not expand to fit the creditor. The creditor must squeeze into the debtor's shoes whatever their size. D. Siegel, Practice Commentary to N.Y. CPLR § 5201:15.

■ Thus, the general rule in New York regarding escrow accounts is that unless the judgment debtor, as grantor, retains an interest in the escrowed property over and above the interest of the grantee, the escrow account cannot be reached by the debtor's judgment creditors. *See Jamaica Savings Bank v. Lefkowitz,* 390 F.Supp. 1357, 1363 (E.D.N.Y.), *aff'd,* 423 U.S. 802, 96 S.Ct. 10, 46 L.Ed.2d 23 (1975); *Creel v. Birmingham Trust National Bank,* 383 F.Supp. 871, 879 (N.D.Ala.1974), *aff'd,* 510 F.2d 1363 (5th Cir.1975); *In re Simon,* 167 F.Supp. 214, 215 (E.D.N.Y.1958); *In re Treiling,* 21 B.R. 940, 943 (Bankr.E.D.N.Y. 1982); *Valerio v. College Point Savings Bank,* 48 Misc.2d 91, 92, 264 N.Y.S.2d 343, 344 (Sup.Ct.Suffolk Co.1965).

This rule is consistent with the Code's definition of property of the estate. Section 541 provides that the debtor's "estate is comprised of all of the following property, wherever located: ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). However, § 541(d) qualifies the otherwise broad scope of this definition by providing that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable inter-

est in such property that the debtor does not hold." *Id.* In other words, "[t]o the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate." 124 Cong.Rec. H11096 (Sept. 28, 1978) (remarks of Sen. DeConcini). *See also In re Treiling,* 21 B.R. 940, 943 (Bankr.E.D.N.Y.1982).

■ It is true that under New York law legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement. *See Press v. Marvalan Industries, Inc.,* 422 F.Supp. 346, 349 (S.D.N.Y. 1976); *In re Ellison Associates,* 13 B.R. 661, 670 (Bankr.S.D.N.Y.1981); *Stanton v. Miller,* 58 N.Y. 192, 201 (1874); *Alexander v. Quality Leather Goods Corp.,* 150 Misc. 577, 579–580, 269 N.Y.S. 499, 502 (Sup.Ct. N.Y.Co.1934). However, it is equally true that the deposit of property placed in escrow

> creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, title will vest at once in him. Hence, although pending full performance of the conditions, the legal title remains in the grantor and is subject to ... the lien of a judgment against him to the extent of his interest therein, it has been held that such lien, obtained with notice of the escrow agreement, is subject to the equity of the grantee.

28 Am.Jur.2d Escrow § 10 (1964). *See also May v. Emerson,* 52 Or. 262, 96 P. 454, 455 (Or.1908).

■ Furthermore, for an escrow to be valid the delivery of the property must be irrevocable. Although the grantor retains a contingent right to repossess the property if the specified condition does not occur, while the property is in the hands of the depositary it must be beyond the possession and control of the grantor. If the grantor reserves the right to revoke the agreement, there is no escrow. 20 N.Y. Jur. (Rev. ed.) Escrow § 8 (1976).

For these reasons, "[c]ourts of bankruptcy recognize that money held in escrow is

not property which vests in the trustee in bankruptcy." *Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257, 261 (1st Cir.1963). *Accord, Newcomb v. Farmers Home Administration,* 744 F.2d 621, 626–27 (8th Cir.1984); *In re Knox Kreations, Inc.,* 656 F.2d 230, 231 (6th Cir.1981); *In re Simon,* 167 F.Supp. 214, 215 (E.D.N.Y.1958).

In *Newcomb v. Farmers Home Administration,* the debtors deposited the amount of a judgment against them into an escrow account. In accordance with the terms of an escrow agreement, the money was to be paid to the FHA in the event that the judgment against the Newcombs was affirmed on appeal. The deposit was made prior to the 90 day preference period. However, the judgment was subsequently affirmed, satisfying the condition in the escrow agreement, less than one month before the debtors filed their bankruptcy petition. As in the case at bar, the trustee in *Newcomb* sought to recover the money as a preference. The Bankruptcy and District Courts held for the Trustee. However, the Eighth Circuit Court of Appeals reversed.[4] In denying recovery to the trustee, the Eighth Circuit recognized that the Code's definition of a transfer is broad enough to include both the transfer of the equitable interest that occurred when the escrow was created and the transfer of legal title that occurred when the condition of the escrow agreement was satisfied. However, the court declared:

> The relevant transfer [for purposes of Code § 547] occurred when the escrow agreement was entered into and the funds turned over to the escrow agent.... At the creation of the escrow there was an unavoidable transfer which left the debtor with only a contingent right to the escrowed funds.... In light of this unavoidable transfer, *the transfer that occurred when the condition of the escrow was met is not avoidable because it did not deprive the debtor's estate of anything of value.* The pending physical transfer cannot be avoided

because it is not a transfer of "property of the estate." Because the relevant transfer occurred more than 90 days prior to the petition for bankruptcy, the trustee is not entitled to turnover of the escrowed funds....

*Newcomb* at 627. (emphasis added).

A similar result was reached in *In re Simon,* 167 F.Supp. 214 (E.D.N.Y.1958), in which a mortgagor was required to deposit funds into an escrow account as security for the mortgagee in the event the mortgagor failed to make certain tax and insurance payments. After the mortgagor filed for bankruptcy under the Bankruptcy Act of 1898 the trustee sought to recover the money as property of the estate. The district court refused, stating:

> [T]he escrow account held by the bank is not such property as the trustee would be vested with under section 70 sub. a(5) of the Bankruptcy Act (Section 110, sub. a(5), Title 11 U.S.C.A.) The extension agreement provides that the mortgagor is to deposit the funds in the escrow account "in order more fully to protect the security of the mortgage," so that those funds, once deposited, are no longer within the control or jurisdiction of the bankrupt.

*Id.* at 215.

Applying the foregoing analysis to the case at bar, the court is constrained to find that the money placed in the escrow account by OPM is not property which the Trustee can reach. The money was deposited as security for BCBS, and was only recoverable by OPM if OPM fulfilled *in toto* its reimbursement obligation. The funds were not within the control of OPM. OPM retained only a contingent right to the funds which was of no value to the estate because it was not an interest which a judgment creditor of OPM could reach. Thus, the transfer of the escrowed funds was not a transfer of property of the debt-

---

4. The trustee had placed strong reliance on the analysis and holding of the Bankruptcy Court in *In re Newcomb,* 32 B.R. 96 (Bankr.W.D.Mo. 1983), aff'd W.D.Mo. Newcomb was reversed subsequent to submission of briefs to this Court. See 744 F.2d 621 (8th Cir.1984).

or, and is not recoverable by the Trustee as a preference.

### C. *The Trustee Cannot Use His Strong-Arm Powers To Avoid The Transfer*

The Trustee argues alternatively that recovery of the escrow account is appropriate under Code § 544(a), because the Trustee's strong-arm powers allow him to defeat a security interest in personal property which is unperfected as of the commencement of the case. Even were this Court to hold that the escrow account was property of the estate, the Trustee's argument would fail because BCBS had a possessory interest in the escrowed monies sufficient to constitute perfection under the U.C.C. prior to the filing of the bankruptcy petition.

Code § 544(a) provides:

The trustee shall have, as of the commencement of the case ... the rights and powers of, or may avoid any transfer of property of the debtor ... that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists....

*Id.*

■ To determine whether a hypothetical lien creditor could obtain a judicial lien on property which is already the subject of a security agreement, the court must again turn to state law. *See Pearlstein v. U.S. Small Business Administration*, 719 F.2d 1169, 1175 (D.C.Cir.1983); *Seymour v. Wildgen*, 137 F.2d 160, 161 (10th Cir.1943); 4 *Collier on Bankruptcy* ¶ 544.02 at 544-8-9 (15th ed. 1981). In this case the applicable state law is N.Y.U.C.C. § 9–301, which provides in pertinent part:

Persons Who Take Priority Over Unperfected Security Interests; Right of "Lien Creditor."

(1) [A]n unperfected security interest is subordinate to the rights of ... a person who becomes a lien creditor before the security interest is perfected;

. . . . .

(3) A "lien creditor" means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes ... a trustee in bankruptcy from the date of the filing of the petition....

*Id.*

Both U.C.C. § 9–301 and Code § 544 provide that the Trustee's interest as a lien creditor is superior only to those security interests which are unperfected as of the filing of the petition. Thus, the pivotal issue in this analysis is whether BCBS' interest in the escrow account was a perfected security interest, at the time OPM filed its petition, as defined by the U.C.C.

The creation and perfection of security interests in personal property are governed by Article 9 of the U.C.C. Section 1–201(37) of the U.C.C. defines a security interest as "an interest in personal property ... which secures payment or performance of an obligation." *Id.*

■ A security interest is valid and enforceable only if there is evidence of an intent to create or retain a security interest. *See In re Miller*, 545 F.2d 916, 918 (5th Cir.), *cert. denied sub nom Nuss v. Looney*, 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977); *Transport Equipment Co. v. Guaranty State Bank*, 518 F.2d 377, 380 (10th Cir.1975); *Shelton v. Erwin*, 472 F.2d 1118, 1120 (8th Cir.1973); *Bruce Lincoln-Mercury Inc. v. Universal C.I.T. Credit Corp.*, 325 F.2d 2, 19 (3d Cir.1963); *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 115–116 (Bankr.S.D.N.Y.1982); *Foley Machinery Co. v. John T. Brady Co.*, 62 Misc.2d 777, 310 N.Y.S.2d 49 (Sup.Ct. Queens Co.1970); N.Y.U.C.C. § 9–102 Official Comment No. 1 (McKinney 1964). The intent of the parties to create a security interest is ascertained by examining the parties' contractual agreement. *See, e.g., Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 532 F.2d 166, 172 (10th Cir.1976).

In the instant case, the escrow agreement clearly evidences the parties' intent to provide recourse to the escrow account to secure OPM's indebtedness. The agreement specifically provided BCBS with the right to obtain the escrow account if OPM defaulted on its reimbursement obligation. Furthermore, the escrow agreement declared that the "parties hereto hereby enter into this agreement to provide BCBS with certain security for the performance by [OPM] of its obligation to BCBS pursuant to Section 17 (Early Termination) of the Lease...."

■ Moreover, it is clear that the collateral, money, provided for in the escrow agreement is covered by Article 9 of the U.C.C. Section 9-304(1) of the U.C.C. specifically provides that a security interest in money can be perfected by the secured party taking possession. *See also In re Atlanta Times, Inc.*, 259 F.Supp. 820, 827 (N.D.Ga.1966), *aff'd sub nom. Sanders v. National Acceptance Co. of America*, 383 F.2d 606 (5th Cir.1967).[5] Hence, no filing of a U.C.C. financing statement was required here.

Regarding the elements that constitute possession, the U.C.C. states only that "if such collateral ... is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notifica-

tion of the secured party's interest." N.Y. U.C.C. § 9-305.

■ The rationale underlying perfection by possession is that "the debtor's lack of possession coupled with actual possession by the creditor, the creditor's agent or the bailee serves 'to provide notice to prospective third party creditors that the debtor no longer has unfettered use of [his] collateral.'" *Ingersoll-Rand Financial Corp. v. Nunley*, 671 F.2d 842, 844-845 (4th Cir.1982), citing *Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702 (9th Cir.1976). *See also In re Copeland*, 531 F.2d 1195 (3d Cir.1976). As the Escrow Agent was fully informed of BCBS' interest in the escrow account, and because the escrow agreement provided adequate notice to any subsequent creditors of OPM that OPM no longer had unfettered use of the funds in the escrow account, the Court is satisfied that delivery of possession to the Escrow Agent as custodian fully satisfied the perfection requirements of the U.C.C.

■ In sum, BCBS fully perfected its security interest in the escrow account several years before OPM filed its bankruptcy petition through possession by the Escrow Agent as bailee. Hence, the Trustee is unable to recover under Code § 544 for "the trustee's rights as a judgment lien

---

**5.** BCBS's contention that the U.C.C. does not apply in this case because the escrow account is a "deposit account" which is excluded from the provisions of Article 9 pursuant to U.C.C. § 9-104(1), is without merit. Section 9-104 declares that the provisions of Article 9 do not apply "to a transfer of an interest in any deposit account," except with respect to proceeds. N.Y. U.C.C. § 9-104(*l*) (McKinney Supp.1972). Section 9-105 defines "deposit-account" as "a demand, time, savings, passbook, or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit." N.Y.U.C.C. § 9-105(e) (McKinney 1977).

It is obvious from the documents in evidence that the transaction between OPM and BCBS did not constitute a transfer of a bank account for purposes of security. Rather, the parties clearly intended to create a security interest in the money. The money was placed in a bank account to earn interest after the creation of the

security interest, by the escrow agent. It would be absurd for the Court to hold that a security interest in money is valid only when the money is held in a desk drawer or lockbox. Rather, it is the better view that a security interest in money, which is perfected by possession by an escrow agent, remains protected by Article 9 even if the money is subsequently deposited in a bank account by the agent.

Similarly, the Trustee's assertion that the escrow account is a "general intangible" is without merit. U.C.C. Section 9-106 provides that "'[general intangibles]' means any personal property ... other than goods, accounts, chattel paper, documents, instruments, and *money*." N.Y.U.C.C. 9-106 (emphasis added). Since the escrow account is, for all intents and purposes, money, it is not a general intangible. *See In re Midas Coin Co., Inc.*, 264 F.Supp. 193 (E.D.Mo.1967), *aff'd on other grounds sub nom. Zuke v. St. Johns Community Bank*, 387 F.2d 118 (8th Cir. 1968).

creditor apply only where there is some interest to which a judgment lien could attach," as of the date of the filing of the bankruptcy petition. *In re Newcomb,* 744 F.2d at 624 (8th Cir.1984).

For the foregoing reasons, the Trustee's motion for summary judgment on the complaint is denied, and BCBS' cross-motion is granted. The Trustee's complaint is dismissed. BCBS' counterclaim is dismissed. See footnote 1 supra.

It is so ordered.