SAMUEL, Judge.
Plaintiffs filed this suit against the Fidelity Homestead Association seeking to recover the sum of $3,800 allegedly misappropriated by the defendant from their “escrow account”. Originally, plaintiffs filed a petition for mandamus to compel the defendant to return the $3,800 to their account. Defendant filed exceptions of improper use' of mandamus and no cause of action to that petition. Judgment on the exceptions was rendered in favor of the defendant, and plaintiffs were given an opportunity to amend their petition. No appeal was taken from this judgment and therefore we make no determination relative thereto.
Plaintiffs then amended their petition alleging defendant had wrongfully disbursed $3,800 of their money without their approval or authorization. Thereafter, by a supplemental and amended petition, plaintiffs further alleged the authentic acts executed by plaintiffs and defendant, consisting of a sale and resale of plaintiffs’ property for loan security, are nullities because the same were not executed according to law.
After trial on the merits there was judgment in favor of defendant and against the plaintiffs, dismissing the suit. Plaintiffs have perfected this appeal from that judgment.
Plaintiffs applied for a loan from defendant on September 8, 1964. On October 23, 1964 a loan for $24,000 was completed, together with a sale and resale of property owned by the plaintiffs. Allain C. Andry, Jr., president of the defendant, also acts as the homestead’s notary. Although his signature appears as the notary passing the acts of sale and resale, in reality they were passed before his brother and signed by Allain C. Andry, Jr. at a later date.
Previous to the application for the loan, plaintiffs acquired a house from Maurice F. Hunt, owner of the Acme House Wrecking Company (hereinafter referred to as Acme). Acme was also hired by plaintiffs to move the house to property owned by plaintiffs at 1217-19 Pauline Street in the City of New Orleans, Louisiana. The contract between the two parties provided for payment of $3,850 upon the completion of the move. Plaintiff’s husband testified he had made a $250 deposit on the contract to Hunt. It is from this move and alleged imcompletions of the contract that, between Acme and plaintiffs, the latters’ troubles began. They assert Acme didn’t complete the work it had contracted to do and as a result they were forced to expend $2,600 of their own money for labor and materials to complete the job.
Acme did not request payment of its contract until June of 1967, approximately three years after the initial relocation. At first Hunt contacted Pitfield about payment. Mr. Pitfield requested a bill for what Hunt thought it was worth so that he could authorize payment. However, Hunt then went directly to defendant and requested $3,800 in payment for his services. Gardebled (the homestead’s building expert) testified he was surprised as he had thought the bill was paid at the time of the loan. Determining the bill hadn’t been paid, he inspected plaintiffs’ property to check compliance with the contract. He did not contact plaintiffs and the inspection took place after plaintiffs had done all the work necessary to complete Acme’s obligations under the contract. Gardebled did not know plaintiffs had done any of the work; he thought all of the work had been done by Acme. Gardebled also had Hunt sign an affidavit wherein the latter declared “all of the work on the above job has been fully completed so far as my portion thereof is concerned.” A check for $3,800 was then issued by the defendant to Acme and charged against plaintiffs’ account.
*881 Plaintiffs learned of the payment to Hunt when they found their account substantially reduced. They contend defendant erred in paying Acme without Mr. Pitfield’s authorization, especially in view of the fact that Acme had not completed the job, and Acme was not due $3,800 as Hunt contended but an amount much smaller than $3,800 because of Acme’s incomplete performance of the contract.
Interconnected with the house relocation is the loan and an oral “escrow agreement” between plaintiffs and defendant. Of the $24,000 loaned, $11,218.24 was placed in “escrow” to be held by the defendant and disbursed as improvements on the house were made. Mr. Pitfield was the owner-contractor of the house and was to do much of the remodeling and repairs to the house himself. Accordingly, the oral agreement provided that as materials were ordered and supplied, or work performed, the seller or worker would submit a bill to be paid to Mr. Pitfield, who would authorize its payment by the defendant. The defendant further checked each bill through its building expert, Gardebled, who also would authorize its payment after an affidavit, prepared by defendant and stating the work had been completed, was signed by the creditor.
The issues presented on appeal concern the validity of the authentic acts and the authority of defendant to release $3,800 after a demand for payment was registered by Acme.
Plaintiffs’ contention that the sale and resale with mortgage is invalid because the notary and witnesses attesting to them were not present when they signed is not well-founded. Authentic acts which do not follow the requisites of form may be construed as acts under private signature. LSA-C.C. Art. 2235; Jeffer v. Li-vaccari, La.App., 148 So.2d 318; see also LSA-C.C. Art. 3305; Chrysler Financial Corp. v. Louisiana Tax Com’n, La.App., 251 So.2d 482. Having judicially acknowledged the execution of the instruments and their signatures, as far as the parties thereto are concerned, plaintiffs are bound by the terms of the acts regardless of whether or not they are in fact authentic. See LSA-C.C. Art. 2242.
The only remaining question is whether or not plaintiffs authorized the payment of $3,800 to Acme.
In his written reasons, the trial court judge found as a fact that at the inception of the loan plaintiffs authorized the defendant through its officer and building inspector to pay Acme for performance of the contract. This is a determination of fact with which we find no manifest error.
Although the oral agreement for the disbursement of funds from plaintiffs’ account is designated by the parties as an “escrow agreement”, the arrangement is not properly escrow; it appears to us to be more properly in the nature of mandate.[1] However, it is unnecessary for us to determine the type of agreement. Regardless of type the result would be the same if plaintiffs authorized defendant to make the payment.
It is evident from the record that at the inception of this loan $3,800 was allocated for payment to Acme. In itemizing his proposed expenditures Mr. Pitfield denoted this amount as payable to Acme. Equally apparent is the fact that at no time did plaintiffs inform the defendant of Acme’s failure of completion until after the payment of $3,800 was made.
Plaintiffs assumed they had to personally authorize payments before funds from their account would be disbursed by the defendant. Mr. Pitfield stated that under this impression he did not see any necessity to inform defendant the contract with Acme *882 had not been completely performed. As has been pointed out, defendant did not know of the non-performance until after payment had been made. Gardebled testified he assumed Acme was paid at the passage of the act of sale and the record satisfies us that such payment was so contemplated. However, Acme did not appear at that time.
We are convinced plaintiffs did authorize the disbursement of $3,800 to Acme. On a form to estimate costs, supplied by the defendant, plaintiffs listed the sum of $3,800 with the notation of “House moved on site.” to be paid to “Acme Demolishing Co.” [2] Of the $24,000 loaned to plaintiffs the sum of $11,218.24 was retained by defendant subject to periodic disbursements. Included in the figure of $11,-218.24 was the $3,800 designated for payment to Acme in connection with the house purchased by plaintiffs from Acme. The balance of the $11,218.24 was to be used for repairs, alterations, additions, etc. on the property involved in the sale and resale. Consistent with the assertion that defendant had the requisite authority to disburse the funds to Acme from the inception of the loan is the fact that Gardebled, who received 1% of construction costs as a fee for his services as the homestead’s building expert, charged the plaintiffs $83.25. This amount was obtained from the sum of $8,325 which represents the figure estimated for the rehabilitation and repairs Mr. Pitfield was to do only on the property which was the subject of the sale and resale. The sum of $8,325 was later reduced to $7,418.25, to which $3,800 was added to make the $11,218.24 held in “escrow” by the defendant. The indication is that Gar-debled reasonably considered the $3,800 as money to be disbursed immediately, necessitating no further approval by plaintiffs.
We agree with the trial court that the authority to pay Acme was given at the inception of the loan; plaintiffs did not revoke that authority prior to payment by defendant; and therefore the authority remained in effect.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.

. An escrow is defined in Wampler v. Wampler, 239 La. 315, 118 So.2d 423, citing 30 [A] C.J.S. Escrows § 1: “as a deed or other instrument deposited with a third person to be held for delivery to the grantee on the performance of a condition or the happening of a certain event.”

. Acme Demolishing Company and Acme House AVrecldng Company are one and the same company, owned and operated by Maurice Hunt.