**In re JAZZLAND, INC.**

**Richard Noble,**

v.

**Federal Insurance Co.**

**Bankruptcy No. 02–11257.**
**Adversary No. 02–01081.**
**No. 04–0467.**

United States District Court,
E.D. Louisiana.

March 31, 2005.

Douglas Scott Draper, Heller, Draper, Hayden, Patrick & Horn, LLC, Joy Lyu Monahan, Heller, Draper, Hayden, Patrick & Horn, LLC, New Orleans, LA, for Richard Noble disbursing agent for Jazzland, Inc., Appellant.

David Joseph Krebs, Krebs, Farley & Pelleteri, LLC, Alberta L. Adams, Krebs, Farley & Pelleteri, LLC, Philip Kirkpatrick Jones, Jr., Liskow & Lewis, James C. Butler, Lemle & Kelleher, LLP, Marguerite Kern Kingsmill, Kingsmill Riess, LLC, John Michael Dubreuil, Kingsmill Riess, LLC, New Orleans, LA, for Federal Insur-

ance Company, Southtrust Bank NA, Covanta Energy Corp, Broadmoor LLC, Appellees.

## ORDER AND REASONS

LEMMON, District Judge.

Jazzland, Inc., through its disbursing agent Richard Noble, filed an appeal (Document 1) of the ruling by the bankruptcy court in the In re Jazzland, Inc. bankruptcy proceeding. The bankruptcy court held that the funds in an account held by South-Trust Bank are not the property of the bankruptcy estate of Jazzland. **IT IS ORDERED** that the judgment of the bankruptcy court is hereby **AFFIRMED**.

## A. Background.

Jazzland, Inc. was formed in 1997 to develop, own, and operate an entertainment theme park in New Orleans, Louisiana. On July 9, 1998, Jazzland executed three Design/Build Contracts with Broadmoor, L.L.C., a general contractor, to design and build the theme park.[1] Under the Design/Build Contract, Jazzland agreed to make periodic progress payments to Broadmoor, while keeping a certain defined percentage of these payments as retainage.[2] The Design/Build Contract provided that half of the retainage was to be deposited into an interest-bearing account:

> One-half (1/2) of the amount so retained shall be deposited in an interest-bearing account (the "Retainage Deposit"). Any interest earned on the Retainage Deposit shall be paid to Contractor or otherwise applied as provided in this Contract at the same time and in the same manner as the Retainag[e]. Notwithstand-

ing the foregoing, Company acknowledges and agrees that there shall be no Retainage on the purchase of rides by Contractor.[3]

The Design/Build Contract provided for the manner in which the retainage would be released by Jazzland to Broadmoor:

> 5.6 *Final Payment.* (a) Upon achievement of Final Acceptance, and after all adjustments and unsettled matters (including Liens, Punchlist Items and matters resulting in backcharge adjustments and other setoffs) have been corrected, completed or otherwise disposed of or resolved to the Company's satisfaction, Contractor shall submit its final invoice for the Retainage

\* \* \* \* \* \*

> Provided the criteria set forth above are reasonably met and Company and Contractor have filed a joint Notice of Cancellation of Contract within the Official Records of Orleans Parish, Louisiana, within thirty (30) Days after receipt and approval of Contractor's final invoice and all other documents required herein, Company shall pay the remaining Retainage to Contractor.[4]

On July 10, 1998, Jazzland and South-Trust Bank, N.A. executed a Credit Agreement for a portion of the theme park's financing. The Credit Agreement contained detailed provisions regarding the retainage for the project, defining "Retainage" to be:

> [A]n amount equal to the Applicable Retainage Percentage of each Advance for Construction Costs due under the construction Contract which will be withheld from each Advance except for

---

**1.** Although three such contracts were executed, the pertinent language appears common to all three.

**2.** Design/Build Contract at § 5.5.

**3.** *Id.*

**4.** *Id.* at § 5.6.

Advances for purchase of the rides as provided in the Budget and will not be disbursed except in accordance with *Section 2.04(J)* hereof.[5]

The percentages specified as retainage under the Credit Agreement precisely matched those set forth in the Design/Build Contract.[6] Section 2.04 J. of the Credit Agreement provided the time frame for the disbursement of the retainage:

> **J. Retainage.** The Bank shall deposit 50% of the Retainage into an interest bearing escrow account maintained with the Bank and shall withhold disbursement of the remaining 50% of the Retainage. Bank shall pay the Construction Costs Retainage (together with interest earned on the Retainage in the escrow account) only upon Provisional Acceptance of the entire Project and satisfaction of the following additional conditions . . . .

Section 2.04 J. then listed eight enumerated suspensive conditions that had to be met for payment of the retainage after provisional acceptance. Under Section 2.04 H., the retainage would be paid to Jazzland's project account, or if an event of default had occurred, could be paid directly to the project's contractor.

Section 2.05 (W) of the Credit Agreement states specifically that the bank is not to be Jazzland's agent:

> (W) **Bank Not Agent of Borrower.** The Borrower understands and agrees that the Bank is not the agent or representative of the Borrower and neither the Borrower nor Contractor is the agent of the Bank, and this Agreement shall not be construed to make the Bank liable to materialmen, contractors, craftsmen, laborers or others for goods or services delivered by them upon the Project, or for debts or claims accruing to the said parties against the Borrower, and it is distinctly understood and agreed that there is no contractual relation either expressed or implied between the Bank, the Contractor or any materialmen, subcontractors, craftsmen, laborers or any other person supplying any work, labor or materials on the Project.[7]

Additionally, Section 9.06 of the Credit Agreement provided SouthTrust with a setoff right against the account:

> **9.06. Right of Setoff.** Upon the occurrence and during the continuance of any Event of Default the Bank is hereby authorized at any time and from time to time, without prior notice to the Borrower (any such notice being expressly waived by the Borrower provided, however, that the Bank shall give the Borrower notice of set off as soon as practicable thereafter), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Bank to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or the Note or any other Loan Document, irrespective of whether or not the Bank shall have made any demand under this Agreement

---

5. "Retainage" is synonymous with "Construction Cost Retainage," and is defined on page 4 of the Credit Agreement.

6. *See* definition of "Applicable Retainage Percentage" on page 2 of the Credit Agreement.

7. *See also* Credit Agreement at Section 9.13 (providing that "This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind Bank in any way or create any contractual duties by Bank to any contractor or subcontractor, materialman, laborer or any other Person except Borrower").

or the Note or such other loan document.

On June 28, 1999, SouthTrust account number 68–262–364, denominated the "SouthTrust Bank as Escrow Agent for Jazzland—Retainage Account," was opened.

On May 30, 2000, Broadmoor issued a Notice of Provisional Acceptance in accordance with Section 10.7 of the Design/Build Contract. On June 9, 2000, Broadmoor submitted an application for final payment under the Design/Build Contract, which included a request for payment of the retainage of $2.68 million. On July 21, 2000, Broadmoor filed a lien with the Orleans Parish Recorder of Mortgages for $11,072,469.00 (amended to $8,342,520.00 on August 29, 2000). The lien was removed on September 11, 2000 after Federal Insurance Company issued a surety bond.

After Jazzland refused to direct the payment of the retainage to Broadmoor, Broadmoor sued Jazzland in the Civil District Court for the Parish of Orleans, State of Louisiana, but the suit was dismissed as premature because the Design/Build Contract required arbitration of disputes. Accordingly, on July 3, 2001, Broadmoor filed an arbitration demand with the American Arbitration Association.

### 1. Proceedings in Bankruptcy Court.

On February 27, 2002, Jazzland filed a Chapter 11 petition for bankruptcy. The automatic bankruptcy stay was modified to allow Broadmoor to continue to arbitrate its claims against Jazzland, but the arbitration was ultimately unsuccessful.

The bankruptcy court held an emergency cash collateral hearing on April 3, 2002, and allowed Jazzland to withdraw up to $493,512.00 from the SouthTrust account.

The bankruptcy court's order specified that it was not to be the law of the case on the issue whether the account was part of Jazzland's estate. Additionally, the bankruptcy judge stated on the record at the hearing on Broadmoor's motion that he did not make a decision on the nature of the funds in the escrow account when he authorized the use of the retainage on an emergency basis.[8]

On April 25, 2002, Broadmoor filed the current adversary proceeding, seeking recovery of the remaining amount held in the SouthTrust escrow account. Broadmoor thereafter assigned its claim to Federal, which moved for summary judgment in the adversary proceeding, asserting that the SouthTrust funds were not property of the bankrupt estate, or alternatively, were subject to an equitable lien in favor of Broadmoor.

On January 14, 2004, the bankruptcy court held a hearing on Federal's motion for summary judgment on the issue of the ownership of the funds in the account. After hearing the arguments of the parties, the bankruptcy judge found that Federal was entitled to summary judgment:

I come down on the side of the argument of the mover that these funds were not property of the estate.

I am impressed by the argument that the funds were earmarked, title to the funds had, in effect, passed to Broadmoor and that Jazzland had no right to these funds. If they had a right to the funds it was only as a conduit to pay the funds over to Broadmoor and because Broadmoor had satisfied all the conditions precedent to the payment of the funds. I think it's uncontested that Federal stands in the same shoes of Broadmoor. And for those reasons I grant the motion for summary judgment

8. Transcript at pp. 28–29.

in favor of ... Federal Insurance Company.... Judgment will be entered to that effect for the reasons stated in the record.[9]

On January 21, 2004, the bankruptcy court entered its judgment, which provides that the "funds deposited into the 'SouthTrust Bank as Escrow Agent for Jazzland—Retainage Account,' account number 68–262–364, are not property of the estate or, if property of the estate, are impressed with an equitable lien in favor of Broadmoor, L.L.C."

## B. Analysis.

Federal argues that it is entitled to the funds in the SouthTrust account because (1) the funds are not property of the estate because title to the retainage passed to Broadmoor before the bankruptcy, (2) the funds in the account are not property of the estate because the retainage account contains earmarked funds, and (3) the funds in the account are not property of the estate because the retainage account is an escrow. Alternatively, Federal argues that the funds in the retainage account were impressed with an equitable lien. In order to prevail Federal need only establish the validity of one of its theories.

### 1. Standard of review.

Rule 9033(d) of the Federal Rules of Bankruptcy Procedure provides:

> The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

"On appeal, a bankruptcy court's findings of fact are review under the clearly erroneous standard, but its conclusions of law are freely reviewable." *Matter of Howe*, 913 F.2d 1138, 1142 n. 1 (5th Cir.1990). The court may affirm the judgment of the bankruptcy court on any ground presented for its consideration, even if this ground did not form the basis for the court's decision. *See In re Williams*, 298 F.3d 458, 462 (5th Cir.2002); *American Nuclear Insurers v. Babcock & Wilcox Co.*, 2002 WL 1334882, at *3 (E.D.La. June 14, 2002), *aff'd*, 2003 WL 21356060 (5th Cir. May 30, 2003) (unpublished).

### 2. The bankrupt estate.

The Bankruptcy Code provides that the commencement of a bankruptcy proceeding "creates an estate," which includes "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Fifth Circuit has recognized the expansive scope of this provision:

> Section 541(a)(1) states that the filing of a bankruptcy petition creates an estate comprising "all legal or equitable interests of the debtor in property as of the commencement of the case." The scope of property rights and interests included in a bankruptcy estate is very broad: The conditional, future, speculative, or equitable nature of an interest does not prevent it from being property of the bankruptcy estate.

*Matter of Kemp*, 52 F.3d 546, 550 (5th Cir.1995).

### 3. The account as "escrow."

 Federal argues that the South-Trust account contained funds held in escrow for Broadmoor and did not form part

**9.** Transcript of proceedings, January 14, 2004, at pp. 30–31.

of the bankrupt estate. Louisiana law determines whether the funds were held in escrow. *See Kemp,* 52 F.3d at 551 ("We look to state law ... to determine whether an escrow agreement existed .... ").[10]

■■■ Under Louisiana law, an escrow is a "deed or other instrument deposited with a third person to be held for delivery to the grantee on the performance of a condition or the happening of a certain event. Escrows are fully recognized in Louisiana and such agreements, if oral, may be proven by parol evidence." *Wampler v. Wampler,* 239 La. 315, 118 So.2d 423, 426 (1960).[11] The money deposited into an escrow account "essentially constitutes a trust fund and can be used only for the purposes of the trust." *MacKendree v. Commercial Nat'l Bank,* 340 So.2d 1080, 1082 (La.App. 1st Cir.1976).

In this case, when Broadmoor presented Jazzland with an invoice for work which had been performed under the Design/Build Contract, Jazzland directed SouthTrust to advance to Broadmoor the amount of the invoice, less the amount of retainage, of which 50 % would be held in escrow for Broadmoor until the conditions for payment of the retainage had been fulfilled.

■■■ The court finds that the funds that were deposited into the SouthTrust account were funds held in escrow for payment to Broadmoor. The Credit Agreement, executed one day after the Design/Build Contract, provided for the creation of an account in which South-Trust held the funds "as Escrow Agent for Jazzland—Retainage Account." Although the Credit Agreement provided that it did not create a contractual relationship with any third parties, it was the Design/Build Contract, not the Credit Agreement, that gave rise to Broadmoor's rights; the Credit Agreement provided only for the creation of the escrow account which fulfilled that requirement of the Design/Build Contract. Because the court finds that the account created pursuant to the Credit Agreement is unambiguously an escrow account, parol evidence such as the affidavit of Maynard C. Brothers is not admissible to interpret the terms of the agreement. *See* La. Civ. Code art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.").

### 4. Escrow under 11 U.S.C. § 541.

■■■ Generally, under bankruptcy law funds held in escrow are not property of the estate:

Once a true escrow has been found, the critical, and frequently litigated, question is whether the assets held in escrow are property of the estate under section 541. In general, most courts have held that assets in escrow are not property of the estate, even though the debtor may have certain rights under the escrow agreement and, therefore in the assets escrowed.

---

10. The Credit Agreement provides in Section 9.07 that it is "governed by, and construed in accordance with, the laws of the State of Louisiana." All parties agree that Louisiana law governs interpretation of the relevant contracts.

11. *See also Meza v. Fidelity Homestead Ass'n,* 271 So.2d 879, 881 n. 1 (La.App. 4th Cir.

1973); *Black's Law Dictionary* 584 (8th ed.2004) (defining "escrow" as "[a] legal document or property delivered by a promisor to a third party to be held by the third party for a given amount of time or until the occurrence of a condition, at which time the third party is to hand over the document or property to the promisee.").

5 Alan N. Resnick and Henry J. Sommer, *Collier on Bankruptcy* ¶ 541.09A[2], at 541–53 (15th ed.2004).[12] Although a few courts have held that escrowed property may form property of the bankrupt estate, these cases are distinguishable on their facts. For example, in *In re Rosenshein,* 136 B.R. 368 (Bankr.S.D.N.Y.1992), the court held that nondebtors could not obtain funds from an escrow account pending further proceedings because of the debtor's competing interest in the fund; the court recognized that "[u]nless and until the conditions of the escrow arrangement are satisfied, the debtors continue to have a beneficial interest in the [escrow], which interest constitutes property of the estate within the meaning of 11 U.S.C. § 541." *Id.* at 372. Most courts have held that only the debtor's contingent right to the return of the funds in escrow is property of the estate. *See Collier on Bankruptcy* ¶ 541.09A[2], at 541–55 ("These courts tend to hold that only the debtor's contingent rights to the possible return of some or all of the escrowed assets are property of the estate."); *Matter of Missionary Baptist Foundation of America, Inc.,* 792 F.2d 502 (5th Cir.1986) (holding that under Texas law estate has a "contingent interest" in escrowed funds).

The court finds the suspensive conditions triggering Broadmoor's entitlement to the funds in escrow occurred prior to Jazzland's bankruptcy. The record reflects that Broadmoor delivered to Jazzland its Notice of Provisional Acceptance in accordance with § 10.7 of the Design/Build Agreement on May 20, 2000. This was the event that satisfied the key condition necessary for payment of the retainage held in escrow. Under the terms of Section 2.04 J. of the Credit Agreement, SouthTrust was to pay the retainage "only upon Provisional Acceptance of the entire project." The record contains the affidavit of John Stewart, President of Broadmoor, who attested that "all of the conditions of the contract for Provisional and Final Acceptance have been satisfied," and there is no countervailing affidavit or other evidence that any suspensive condition remains unfulfilled. Under Louisiana law, once the suspensive conditions were fulfilled, Broadmoor did not simply have the right to the funds in the escrow; those funds belonged to Broadmoor. Accordingly, those funds did not form part of the bankrupt estate. *See* Thomas M. Byrne, *Escrows and Bankruptcy,* 48 Bus. Law. 761, 762 (Feb.1993) ("When the condition or conditions governing the escrow are satisfied, legal title to the escrowed property passes by operation of law. The party that transferred the property into escrow loses all interest in it."). For example, in *Matter of O.P.M. Leasing Services, Inc.,* 46 B.R. 661 (Bankr. S.D.N.Y.1985), O.P.M. placed funds in escrow to be delivered to BCBS in the event that O.P.M. defaulted on a reimbursement obligation owed to BCBS. O.P.M. defaulted, and the escrow agent paid the funds in escrow to BCBS. O.P.M. then declared bankruptcy, and its trustee sought to void the escrow payment as a preferential transfer. The court held that the funds could not be recovered by the trustee:

> [T]he deposit of property placed in escrow
>
> > creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, title will vest at once in him. Hence, al-

**12.** Similarly, in some cases contractors "are required to report" amounts earned that are withheld as retainage "as ordinary income and pay tax on even before they have received the funds." Richard A. Stockenberg and Jennifer S. Woodbury, *Retainage Revisited: A Time to Revise and Reform,* 16 Construction Law 41 (January 1996).

though pending full performance of the conditions, the legal title remains in the grantor and is subject to ... the lien of a judgment against him to the extent of his interest therein, it has been held that such lien, obtained with notice of the escrow agreement, is subject to the equity of the grantee.

Furthermore, for an escrow to be valid the delivery of the property must be irrevocable. Although the grantor retains a contingent right to repossess the property if the specified condition does not occur, while the property is in the hands of the depositary it must be beyond the possession and control of the grantor. If the grantor reserves the right to revoke the agreement, there is no escrow.

For these reasons, "[c]ourts of bankruptcy recognize that money held in escrow is not property which vests in the trustee in bankruptcy."

\* \* \* \* \* \*

Applying the foregoing analysis to the case at bar, the court is constrained to find that the money placed in the escrow account by OPM is not property which the Trustee can reach. The money was deposited as security for BCBS and was only recoverable by OPM if OPM fulfilled in toto its reimbursement obligation. The funds were not within the control of OPM. OPM retained only a contingent right to the funds which was of no value to the estate because it was not an interest which a judgment creditor of OPM could reach. Thus, the transfer of the escrowed funds was not a transfer of property of the debtor and is not recoverable by the Trustee as a preference.

*Id.* at 668–69.[13] Thus, because the court finds that the contingency which terminated Jazzland's interest in the funds in escrow occurred prior to Jazzland's bankruptcy, these funds were not property of the estate.

## C. Conclusions.

The court finds that there are no disputed issues of material fact and that Broadmoor is entitled to summary judgment that the funds in the SouthTrust account were held in escrow for Broadmoor, and that Broadmoor had fulfilled the conditions necessary for payment prior to the filing of bankruptcy. These funds were not therefore property of the estate. Accordingly, the bankruptcy court's grant of summary judgment is affirmed.[14]

---

13. *See also Missionary Baptist,* 792 F.2d at 506 (distinguishing cases allegedly holding that escrow accounts can never be property of the debtor's estate by noting that "in each of the cases, the contingency which would wipe out the debtor's interest in an escrow fund occurred prior to bankruptcy.").

14. Because the court finds that the bankruptcy court correctly granted summary judgment to Federal because the funds in the South-Trust account were held in escrow, it does not determine whether summary judgment in favor of Federal was appropriate on any other ground.