DECISION
Before this Court are three motions, each of which seek the payment of $367,246, currently held in the Registry of the Superior Court (Registry), to the respective moving parties.[1] This case is the receivership of Mixitforme, Inc., (Mixitforme) a Rhode Island corporation which was formerly in the business of selling and distributing electronic equipment. The motions before the Court present, if not novel questions of law, then at least a novel confluence of circumstances.
Gamma Trading, Inc. and Joseph Hassin (collectively "Gamma") allege that they are secured creditors of Mixitforme and seek payment of the Registry funds on that basis. Separately, Bank Rhode Island (BRI) alleges that it has a security interest, which has priority over any interest of Gamma, and seeks payment on that basis. Joseph Ferucci is the court-appointed Receiver of Mixitforme, and requests that the Registry funds be paid to him on behalf of all unsecured creditors because, he argues, neither Gamma nor BRI have secured claims to the funds. The Receiver and Gamma claim entitlement to all of the Registry funds; BRI claims an entitlement to approximately $289,841 as the traceable proceeds of Mixitforme's deposit account with BRI. The Court has jurisdiction of this receivership under G.L. 1956 §§ 7-1.2-1314 and7-1.2-1316.
 Facts/Travel
The operative facts are undisputed for purposes of this motion. In January 2006, Gamma petitioned for the appointment of a receiver of Mixitforme because it alleged that Mixitforme owed Gamma a substantial amount of money — approximately $367,246 — arising from the failure to deliver certain goods:. (Gamma Pet. Appt. Receiver ¶ 3-12, Jan. 13, 2006.) Gamma alleged that "there [was] a substantial likelihood" that Mixitforme's funds would be "absconded with if not having been dissipated already," and that appointment of a receiver was necessary to preserve the assets of Mixitforme for the benefit of all of its creditors. Id. ¶ 13.
In lieu of appointing a receiver at that point, Gamma and Mixitforme reached an agreement under this Court's supervision that Mixitforme would place the disputed amount into the Registry where "the funds shall be escrowed until final resolution of all claims by and between the parties in Superior Court." (Stipulated Order ¶¶ 1, 4, C.A. No. 06-0297, Jan. 24, 2006.) Shortly thereafter, Mixitforme purchased a cashier's check for approximately $289,841 from BRI, using funds from its deposit account with BRI, and paid that check to its counsel, a lawyer for the firm Duffy, Sweeney, Scott, Ltd. (Duffy). The cashier's check was deposited into Duffy's client account with Citizens Bank (Citizens).[2] Counsel then funded the escrow account by writing a check for $367,246[3] payable to the Registry and drawn on Duffy's client account with Citizens.
In March, 2006, while the suit between Gamma and Mixitforme was pending, BRI brought its own petition for the appointment of a receiver. BRI alleges that Mixitforme owes it over $900,000, which is the outstanding balance on two promissory notes, and that Mixitforme has defaulted on its obligations under the notes. (Receivership Proof of Claim of BRI ¶¶ 8, 11, Aug. 22, 2006.) That indebtedness was secured by what BRI alleges to be a perfected security interest in substantially all of Mixitforme's business assets, including deposit accounts.See id. ¶¶ 4, 5. It also contends that approximately $289,841 of the Registry funds is traceable to Mixitforme's deposit account with BRI.Id. ¶ 5. Therefore, BRI's position is that it has a perfected security interest in $289,841 of the funds currently deposited in the Registry, and has moved for payment on that basis. Both the Receiver and Gamma object to BRI's motion.
Gamma and the Receiver both deny that BRI has a security interest in the funds. They contend that BRI lost any security interest in those funds, pursuant to G.L. 1956 § 6A-9-332, when the funds were transferred out of the BRI account, into the Duffy client account, and then into the Registry. Therefore, the Receiver has moved that the funds be paid to him for the benefit of all unsecured creditors of Mixitforme. However, while Gamma agrees with the Receiver that BRI has no security interest, it objects to the funds being paid to the Receiver. Instead, Gamma contends that it has a perfected security interest in the Registry funds, arising out of the Stipulated Order which followed its receivership petition, which would give it priority over the Receiver. Therefore, both BRI and Gamma have objected to the Receiver's motion, Gamma has moved for payment of the funds to itself, and BRI and the Receiver have objected to Gamma's motion.
Following unsuccessful attempts to settle this dispute, this Court held a hearing in order to determine whether the respective motions could be resolved as a matter of law, or whether discovery and further proceedings were needed. (Amended Scheduling Order, ¶¶ 6, 7, C.A. No. 06-1626, Sep. 28, 2006.)
 Analysis
This dispute revolves around the interpretation of Rhode Island's enactment of Article 9 of the Uniform Commercial Code (UCC), which pertains to Secured Transactions.[4] Because the events giving rise to BRI's purported security interest occurred first in time, the Court will first examine any interest of BRI in the Registry funds. Then, if necessary, the Court will address whether or not Gamma has a valid, perfected security interest in the Registry funds, and whether the Receiver has any claim to the funds.
It appears undisputed that BRI and Mixitforme entered into a security agreement on November 18, 2005. (Security Agreement, Ex. A to BRI's Mem. Opp to Gamma Mot., Aug. 1, 2006.) That agreement granted a security interest to BRI in all of Mixitforme's presently owned assets, future-acquired assets, and proceeds of those assets. Id. at 1-2, 3. Deposit accounts are specifically included in the collateral described in the security agreement. Id. at 1. BRI's security interest was perfected as a matter of law because it had "control" of the deposit account.See § 9-312(b)(1) (providing that "[a] security interest in a deposit account may be perfected only by control" under § 9-314); § 9-104 (providing that a secured party has "control" of a deposit account if it is the bank with which the deposit account is maintained).[5]
Therefore, it appears clear that BRI obtained a security interest in the deposit account, and that security interest was perfected.
As a general rule, security interests attach to any "identifiable proceeds of collateral" except as otherwise provided in Article 9. Section 9-315(a)(2). Proceeds are given an extremely broad definition:
 "'Proceeds,'. . . means the following property:
 (i) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
 (ii) Whatever is collected on, or distributed on account of, collateral;
 (iii) Rights arising out of collateral;
 (iv) To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
 (v) To the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral." Section 9-102(64).
This definition of proceeds is broad, and the Registry funds clearly fit within that definition.[6] Whether or not BRI's security interest continued in the proceeds of its account, however, depends on the effect of § 9-332(b).
Section 9-332 — Security Interests in Deposit Accounts
Section 9-332 constitutes an exception to the rule that security interests attach to proceeds of collateral:
 "[a] transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party." Section 9-332(b) (emphasis added).
Section 9-332(a) states a similar rule for transfers of money, as opposed to transfers of funds from a deposit account.[7] The section is a new provision whose purpose is to provide "[b]road protection for transferees" so that "security interests in deposit accounts do not impair the free flow of funds," and was developed as part of the 2000 revision of Article 9. Id., Off. Com. 1, 3. By minimizing "the likelihood that a secured party will enjoy a claim to whatever the transferee purchases with the funds," § 9-332 provides protection for transferees who, as a result, need not concern themselves with the possibility that the funds or money might be subject to a preexisting security interest. Id.
Gamma and the Receiver argue that BRI lost its security interest as a result of § 9- 332. BRI responds that § 9-332 is inapplicable to these facts, that its security interest continues in the traceable proceeds, and that, therefore, the Court should distribute $289,841 of the Registry funds to BRI. There appears to be little case law applying this new section, both in and outside of Rhode Island, so the Court will look to the Official Comments and to other sections of the UCC for guidance in its interpretation.
Revised Article 9 draws a distinction between the deposit account — rights to payment from a bank — and the funds from that deposit account. See, e.g., § 9-332, Off. Com. 2 (stating that "[s]ubsection (b) applies to transfers of funds from a deposit account; it does not apply to transfers of the deposit account itself or of an interest therein"). A deposit account is simply a collection of rights that a depositor has with respect to his bank — most notably, the right to be paid or to have payments made on the depositor's behalf. See § 9-102(29);[8]Sonic Eng'g, Inc. v. Konover Constr. Co. S., No. CV030824817S, 2003 Conn. Super. LEXIS 2436, *12 (Conn.Super.Ct. 2003) (noting that "bank accounts. . . are, analytically, debts owed by the bank to its customer"). Those rights must be distinguished from the actual funds held by the bank. These "funds" are described as "credits running in favor" of a person or entity. Section 9-332, Off. Com. 2. These "funds" exist in the form of currency in a vault or credits held in some higher level financial institution. See § 9-332, Off. Com. 2. The exact form of these funds is unimportant, but the distinction between "funds from a deposit account" and the rights to a deposit account is a crucial one.
Example 1 in Official Comment 2 illustrates the basic operation of § 9-332(b):
 "Debtor maintains a deposit account with Bank A. The deposit account is subject to a perfected security interest in favor of Lender. Debtor draws a check on the account, payable to Payee. Inasmuch as the check is not the proceeds of the deposit account (it is an order to pay funds from the deposit account), Lender's security interest in the deposit account does not give rise to a security interest in the check. Payee deposits the check into its own deposit account, and Bank A pays it. Unless Payee acted in collusion with Debtor in violating Lender's rights, Payee takes the funds (the credits running in favor of Payee) free of Lender's security interest. This is true regardless of whether Payee is a holder in due course of the check and even if Payee gave no value for the check." Id., Off. Com. 2.
This Comment illustrates that a check is not proceeds of a deposit account, but is simply an order to pay funds from the deposit account. Once cashed, however, funds are transferred from Bank A to Payee's bank.See id., Off. Com. 2 (noting that a "transfer of funds from a deposit account, to which subsection (b) applies, normally will be made by check, by funds transfer, or by debiting the debtor's deposit account and crediting another depositor's account.") Those transferred funds are proceeds, but under § 9-332(b), those funds are not subject to the security interest in the deposit account. Payee's bank holds the funds, for Payee's benefit, free of any security interest whether or not Payee was a holder in due course as defined by Article 3. See § 3-302 (defining holder in due course).
While security interests do not attach to proceeds which are "funds," the following example indicates that there may be other proceeds of the deposit account, which are not funds, to which the security interest may attach:
 Example 2: Debtor maintains a deposit account with Bank A. The deposit account is subject to a perfected security interest in favor of Lender. At Bank B's suggestion, Debtor moves the funds from the account at Bank A to Debtor's deposit account with Bank B. Unless Bank B acted in collusion with Debtor in violating Lender's rights, Bank B takes the funds (the credits running in favor of Bank B) free from Lender's security interest. See subsection (b). However, inasmuch as the deposit account maintained with Bank B constitutes the proceeds of the deposit account at Bank A, Lender's security interest would attach to that account as proceeds. See section 9-315." Id., Off. Com. 3 (emphasis added).
In this example, Debtor caused the funds to be moved from the encumbered deposit account at Bank A to Debtor's unencumbered deposit account with Bank B. When Bank B accepted the funds on behalf of Debtor, at the same time it incurred an obligation to pay Debtor pursuant to a deposit agreement. Both the funds held by Bank B and Debtor's deposit account rights against Bank B are proceeds. However, Lender's security interest only attaches to Debtor's deposit account rights, not to the funds — i.e., the credits running in favor of Bank B.[9]
This analysis is also applicable to the situation where a debtor withdraws a cashier's check, although the distinction between a check and a cashier's check should be noted:[10]
 "Subsection (b) also would apply if, in the example, Bank A debited Debtor's deposit account in exchange for the issuance of Bank A's cashier's check. Lender's security interest would attach to the cashier's check as proceeds of the deposit account, and the rules applicable to instruments would govern any competing claims to the cashier's check. See, e.g., sections 3-306, 9-322, 9-330, and 9-331." Id., Off. Com. 2 (emphasis added).
Unlike a standard, personal check, the Debtor must purchase the cashier's check from his bank. The bank debits the Debtor's account when the check is issued, not when the check is presented for payment by a transferee. Therefore, while a personal check is not proceeds, a cashier's check is proceeds. In the above example, because the check is proceeds and, therefore, subject to the security interest, Payee's entitlement to the check depends on whether Payee is a "holder in due course" within the meaning of Article 3. See §§ 3-302, 3-306. This is consistent with the wording of § 9-332 because a cashier's check is not "funds" from a deposit account — it is a negotiable instrument. Those funds that were debited on the purchase of the check become the property of Bank A and are proceeds of Debtor's deposit account.[11] Section 9-332(b) operates, however, to insulate Bank A from any claim to the funds that Lender may claim as proceeds of collateral.[12]
The practical significance of the distinction — between the funds in a deposit account and that which is received in exchange for those funds — may not be immediately apparent. If Debtor receives equivalent value in exchange for any funds transferred, then there is little effect. Although Lender cannot reach the funds, it can satisfy its loan with the non-funds proceeds that are received in exchange for the funds. However, if Debtor withdraws and dissipates the funds without receiving anything of value, then Lender's security interest in the deposit account becomes worthless as collateral. The funds transferred would not be subject to any security interest in the hands of that transferee, (unless the transferee colluded with Debtor to violate the rights of the secured party) and there would be no other proceeds from which to satisfy the loan. See § 9-332(b).
The Security Interest in Mixitforme's Deposit Account with BRI
With these concepts in mind, the Court will now turn to the case at bar. Prior to the events in question, BRI had a perfected a security interest in Mixitforme's deposit account held at BRI. Mixitforme then purchased a cashier's check in the amount of $289,841. When that happened, BRI's security interest attached to the cashier's check as proceeds of the deposit account, but not to the "funds from a deposit account" — the credits running in favor of BRI. See § 9-332(b), Off. Com. 2, Example 1 (explained above). Even though the issuer of the cashier's check happens also to be the secured party, the funds debited by BRI became relieved of the security interest under § 9-332(b). Once Duffy cashed and BRI paid the cashier's check, BRI's unencumbered funds were transferred to Duffy's client account at Citizens Bank, and those funds were free of any security interest from the deposit account.
However, BRI did gain a security interest in the proceeds of its deposit account which were not funds — i.e., the cashier's check. When Duffy cashed the check, it received deposit account rights from Citizens in the amount of $289,841 which also were proceeds of the cashier's check.[13] While BRI may have had under Article 3 a claim to the cashier's check, or a defense to paying the cashier's check, BRI did pay the check. Therefore, while the unencumbered funds were transferred to Citizens free of any security interest, at the same time BRI gained a security interest in Mixitforme's rights to the Duffy client account at Citizens as proceeds of the cashier's check. See R.I. Sup. Ct. Art. V, Rule 1.15 (describing an attorney's obligations with respect to funds held by an attorney for the client's benefit).
Similarly, when Duffy paid the Registry on behalf of Mixitforme, the Registry received and cashed Duffy's check. The check was not a cashier's check, (Ex. E to BRI Mem. Obj. to Gamma Mot.), so consistent with the Official Comment 2 to § 9-332, the check was not proceeds. When the Registry cashed the check, however, the Registry's bank received "funds" from the Citizens deposit account: credits running in favor of the Registry's bank and held for the benefit of the Registry.[14] By operation of § 9-332(b), the Registry's bank took those funds free of any security interest in those funds, even though they would fit the definition of proceeds, and regardless of whether it was a holder in due course under Article 3. Those funds are now unencumbered in the possession of the Registry's bank.
Mixitforme received something in return which is proceeds, however, and to which § 9-332(b) does not apply. In exchange for its rights to the Duffy client account, which were subject to BRI's security interest, Mixitforme received a right to be paid from the Registry subject to whatever claims were asserted by Gamma (escrow rights). See Stipulated Order ¶ 3, C.A. No. 06-0297 ("The funds shall be escrowed until final resolution of all claims by and between the parties in the Superior Court.") Therefore, while BRI gained no security interest in the Registry funds, it gained a security interest in the non-funds proceeds of the deposit account — i.e, the escrow rights.
BRI argues that it has a continuing security interest in the funds. While these arguments are unpersuasive in light of the above analysis, the Court will briefly address them. BRI argues that because "title" to the funds remained in Mixitforme, no transfer has occurred here within the meaning of § 9-332. As support for its argument, BRI cites to Black's Law Dictionary's definition of transferee: "one to whom a property interest is conveyed." BRI Mem. Opp. Gamma Mot. 3. (citing Black's Law Dictionary 1536 (8th ed. 2004)). Because "title" to the funds remained in Mixitforme, it argues that no transfer has occurred here, that Duffy and the Registry were not transferees within the meaning of § 9-332, and, therefore, § 9-332 should not apply here.
The Court rejects this line of argument. At the outset, it notes that general notions of "title" are not terribly helpful in resolving competing claims under the UCC:
 "'Title?' Generations of law students, lawyers, and law professors struggled to determine the mystic moment when title passed.
 "'That's all over now," he says in sorrow. It was a wonderful game, almost as exciting as common-law pleading.
 Now we have the Uniform Commercial Code, which makes things so much easier." Hillman on Commercial Loan Documentation, 10-2 (Hemmendinger, 5th ed., Rel. #6, Aug. 2006).
The preceding quote, while tongue-in-cheek, adequately describes this Court's view that it is more fruitful to interpret the text of the UCC than to engage in an analysis of "title."
It is sufficient only to note that one need not dispose of the entire "title" in order to accomplish a transfer even as it is defined by BRI.See Black's Law Dictionary 1497 (6th ed. 1990) (defining "transferee" as "one to whom a transfer is made" and defining "transfer" as the "sale and every other method, direct or indirect, of disposing of or parting with the property or an interest therein, or with thepossession thereof") (emphasis added). It is true that Duffy took the funds only to hold them on behalf of Mixitforme, subject to the firm's professional and fiduciary obligations. However, it took possession of those funds, and possession is a property right. So while Mixitforme may only have transferred to Duffy a limited property interest, there was a transfer. Similarly, the Registry took possession of the funds and is therefore a transferee under § 9-332. That possession is subject to the rights of Gamma and Mixitforme. Although a party other than the Registry is ultimately entitled to payment of the funds, the Registry is still a transferee.
It simply makes no sense to find that no transfer occurred here. Rather, the proper mode of analysis is to analyze exactly what rights were transferred, what rights were received, and whether a security interest attaches to either the former or the latter. BRI's analysis suffers both from a failure to recognize § 9-332 as an exception to the rule that security interests attach to proceeds, and from a failure to distinguish between the different types of rights and interests that arise when funds are transferred from an encumbered deposit account. Once the appropriate distinctions are made, however, § 9- 332 provides a sensible allocation of rights between debtors, transferees, and secured parties.
In addition, BRI argues that its interpretation does not conflict with the policy underlying § 9-332 — promoting the free flow of funds — but this contention is clearly incorrect. For example, assume that either Duffy or the Clerk of the Court had violated their respective duties and dissipated the proceeds of the cashier's check at a casino.[15]
Obviously there would be civil and/or criminal liability for such an act, but as long as they did not act in collusion, see § 9-332(b), the transferred funds would not be subject to any security interest and the casino would keep the funds. The reason for this seemingly unjust result is clear. Transferees — the casino in this example — should not be concerned with whether or not money or funds from a deposit account are subject to pre-existing security interests. If they were subject to those interests, vigilant transferees would have to expend time and money in order to determine whether the funds were subject to a security interest. Those costs would hinder the free flow of funds in violation of the basic policy of § 9-332. Section 9-332 reflects a policy that transferees of money and of funds from a deposit account should not have to worry about whether a transferor is violating his fiduciary rights or the rights of a secured party. Therefore, § 9-332 sets a high standard of wrongful conduct — collusion — before it will impose liability on a transferee. See GE Capital Corp. v. Union Planters Bank, N.A. (In reMach., Inc.), 342 B.R. 790, 798 (Bankr. D. Mo. 2006) (noting that the use of the collusion standard in § 9-332 protects all transferees except for those "truly bad actor[s]").
On the other hand, extending security interests in non-funds proceeds, such as Mixitforme's rights to the Duffy client account or Mixitforme's escrow rights in the Registry account, does not inhibit the free flow of funds. Therefore, security interests do attach to such proceeds and to the extent that they have value, secured parties can utilize them. It is not yet clear whether BRI's security interest in Mixitforme's escrow rights has any value to BRI. That will depend on the resolution of the various arguments asserted by Gamma and by the Receiver, who has succeeded to the assets and liabilities of Mixitforme as a consequence of his appointment.
Whether Gamma Has a Security Interest in the Registry Funds
Having concluded that BRI has no security interest in the Registry funds, the Court must now determine whether Gamma has a security interest that would entitle Gamma to payment at this time. Specifically, the Court must consider whether the Stipulated Order gave Gamma a security interest in the funds, whether that interest is perfected, and if so, whether Gamma is entitled to payment at this time as a result of any security interest. The Court must also consider the effect of a statute which allows a receiver to dissolve attachments made within 4 months of the receivership petition. See G.L. 1956 § 10-5-42.
In order for a security interest to attach and therefore be enforceable against a debtor, certain requirements must be fulfilled. The requirements are 1) that the secured party give value, 2) that the debtor have rights in the collateral, and 3) one of four statutory requirements must be fulfilled, the most common of which is for the debtor to authenticate a security agreement which provides a description of the collateral. Section 9-203(b). In order to be enforceable against third parties such as the Receiver, that interest must also be perfected.
Gamma alleges that the Stipulated Order created a security interest in the Registry funds and that Gamma gave value by consenting to the creation of the Registry escrow in lieu of the appointment of a receiver. It further argues that the Stipulated Order met the authentication requirement because it was signed by Mixitforme's counsel, and that it clearly describes the collateral as the $376,246 deposit in the Registry. Finally, Gamma alleges that the security interest was perfected under § 9-313(a) by possession of the collateral, because the Registry holds the funds "for the benefit of" Gamma. The Court will analyze each contention seriatim.[16]
Before analyzing whether the Registry escrow met the various technical requirements for a security interest to attach, the Court must first consider whether a security interest is at issue here. BRI and the Receiver contend that there is no evidence of "intent" by the parties to enter into a "security agreement." They argue that an escrow agreement such as the Stipulated Order was not intended to be a security agreement and, therefore, it did not create a security interest in favor of Gamma. Gamma responds by urging the Court to look to the substance, rather than the form, of the transaction to find that a security agreement exists.
Obviously, the Stipulated Order does not make reference to any "security agreement" and lacks a degree of formality often found in security agreements. However, lack of formality does not necessarily mean that an Article 9 security interest does not exist. It is of note that, unlike its predecessor, Revised Article 9 does not make reference to "intent" in determining whether Article 9 applies to given transaction. Compare § 9-109(a) (providing that Article 9 applies to any "transaction, regardless of its form, that creates a security interest in personal property. . ."); with § 9-102 of Former UCC Article 9, 3A Uniform Laws Annotated (2002) (providing that Article 9 applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property") (emphasis added). Therefore, the Court will analyze the law as it is now written, and when applying case law, the Court will be mindful of whether it applied the present or former Article 9. See, e.g., E. Turgeon Constr. Co. v. Elhatton Plumbing Heating Co., 110 R.I. 303, 308 (R.I. 1972) (referring to an "intent to create a security interest").
Article 9 provides that a security agreement is an "an agreement that creates or provides for a security interest." Section 9-102(73). An agreement is defined as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title." Section 1-201(3). This definition suggests that an agreement is not merely a document and is not limited to words on a page, but instead directs courts to look to the substance, and not the form, of a transaction. See, e.g., In re Rite-Cap, Inc., 7 B.R. 113,114-16 (Bankr. D.R.I. 1980) (finding that despite lacking the words "pledge," "collateral," or "security," the arrangement constituted the creation of a security interest.) If that agreement creates or provides for a security interest, then it does not matter whether those words are explicitly used.[17]
This is not to say that intent is completely irrelevant in determining whether a security interest is at issue. However, the parties focus on the wrong intent. It does not matter whether the parties comprehended that their transaction would create a "security interest" or "security agreement" to which Article 9 applies. What matters is whether the parties agreed or intended to enter a transaction which fits the legal definition of a security agreement — an agreement to create a security interest — regardless of whether the parties fully understood the legal ramifications of entering that transaction.
A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Section 1-201(37). "Whether a transaction creates a lease or security interest is determined by the facts of each case." Section 1-201(37)(i). Therefore, this Court will look to whether, in creating the Registry escrow, Mixitforme granted Gamma an interest which secures the payment of an obligation. Given the above definition of "security interest," the Court cannot reach any conclusion other than that a security interest was created here. In this case, both parties clearly intended to enter the escrow arrangement. The escrow arrangement caused Mixitforme to set aside a specific source of funds, in the hands of a neutral third party, out of which any liability of Mixitforme to Gamma would be satisfied in the event that Gamma obtained a judgment. Such an escrow arrangement, as a matter of law, creates a security interest in favor of Gamma. The affidavits submitted by each side do not contradict that the escrow was designed to have such an effect — they merely demonstrate disagreement as to the legal classification of the escrow.
BRI and the Receiver focus on the fact that Mixitforme disputed that it owed any money to Gamma, and, therefore, argue that the escrow arrangement could not possibly have transferred a security interest to Gamma. However, a dispute as to the existence or amount of the underlying obligation does not mean that Gamma could not have a security interest in the Registry funds securing that obligation. If it turned out that Mixitforme had no underlying obligation to Gamma, then Mixitforme would be entitled to return of the funds. However, the fact remains that specific property was set aside in order to provide Gamma a source of payment for an obligation. That is a security interest under Article 9.
BRI relies heavily on Cramer v. Burnham, No. 91-100-S, 1994 WL 240394
(D.N.H. 1994). The Court finds BRI's reliance on this case to be unpersuasive, in part because it was decided under the prior Article 9. In that case, a creditor had obtained an attachment on a parcel of real estate owned by the debtor. Id. at 1. So that the home could be sold, the creditor agreed to release the attachment on the condition that the proceeds of the sale (in excess of any mortgages) would be placed in escrow. Id. That escrow was held by an attorney as escrow agent for the creditor and debtor. The IRS then attempted to levy on the escrow account, and the attorney placed the funds into the registry of the appropriate court. Id. Over the creditor's objection, the Court held that the escrow did not create a security interest; at most, the escrow amounted to a pre-judgment attachment which was subordinate to an IRS tax lien. Id. at 3-4.
In considering whether that arrangement constituted a security interest, the Cramer court focused heavily on the intent of the parties to the escrow arrangement. Id. The court found no intent to create a security interest to secure payment — instead it found that the escrow was only "intended to replace the attachment." Id. at 4 (internal quotations omitted). This Court is not persuaded that the distinction is a valid one — while the escrow was intended to replace the attachment, certainly the attachment was intended to secure payment of the original obligation between the creditor and the debtor. In any case,Cramer involved the unique circumstance of an IRS tax lien, which apparently has priority over a pre-judgment attachment, and is not at issue in this case. Therefore, Cramer is at least partially distinguishable, but to the extent that it relies on the intent of the parties rather than the substance of the escrow transaction, this Court declines to follow it.
Having concluded that the escrow arrangement created a security interest in favor of Gamma, the Court must now determine if that interest is perfected. Perfection is a critical issue because if Gamma's interest in the Registry funds is unperfected, it would be subordinate to the rights of the Receiver, who has the status of a lien creditor under the UCC. See § 9-102(52(iv) (defining a lien creditor to include a receiver in equity from the time of appointment); § 9-317(a)(2) (providing that, subject to certain inapplicable exceptions, security interests are subordinate to the rights of those who become lien creditors before that security interest is perfected).
Article 9 describes various ways in which a security interest may be perfected. The most common method of perfecting a security interest under the UCC is by filing a financing statement with the Secretary of State. See § 9-310(a) (stating that "[e]xcept as otherwise provided in subsection (b) and [ § 9-312(b) — perfection by control or possession], a financing statement must be filed to perfect all security interests and agricultural liens"). Gamma argues that it has a security interest in money which may be perfected by possession under § 9-313(a).[18] In fact, possession is the only means by which a secured party may perfect a security interest in money. Section 9-312(b)(3). While Article 9 does not define "possession," the Comments state that "if the collateral is in possession of an agent of the secured party for the purposes of possessing on behalf of the secured party, and if the agent is not also an agent of the debtor, the secured party has taken actual possession." Section 9-313, Off. Com. 3.
Before analyzing whether Gamma is deemed to have taken possession, the Court must first classify Gamma's collateral in order to determine whether possession is even a permissible means of perfection. The collateral as described by the Stipulated Order is "the sum of $367,246." (Stipulated Order ¶ 1.) While Gamma contends that this is money, the Court questions this conclusion.[19] The collateral delivered to the escrow agent was a check, which is a negotiable instrument under the UCC. See § 3-104. When the Registry cashed the check with its bank, the bank received funds from Citizens and credited the Registry's account. So it seems that the funds in the Registry are properly classified as proceeds of the check, and became perfected only if the security interest in the original collateral was perfected. Section 9-315(c).[20] However, since an instrument may also be perfected by possession, the distinction is unimportant here, and the case will still turn on whether Gamma has "possession" of the collateral. See § 9-313(a). Therefore, the Court must analyze whether Gamma is considered to be in "possession" of the collateral. If so, then it has a perfected security interest in the Registry funds.
The Official Comments to § 9-313 indicate that principals of agency apply in determining whether a secured party has taken possession of collateral:
 "For example, if the collateral is in possession of an agent of the secured party for the purposes of possessing on behalf of the secured party, and if the agent is not also an agent of the debtor, the secured party has taken actual possession, and subsection (c) does not apply." Section 9-313, Off. Com. 3.
Problems arise in the case of an escrow agent, however, because the escrow agent owes duties to both the secured party and to the debtor:
 "Sometimes a person holds collateral both as an agent of the secured party and as an agent of the debtor. The fact of dual agency is not of itself inconsistent with the secured party's having taken possession (and thereby having rendered subsection (c) inapplicable). The debtor cannot qualify as an agent for the secured party for purposes of the secured party's taking possession." Id.
Although a person may be so closely connected with a debtor, such as the debtor's attorney, that the secured party cannot be deemed to have possession,
 "[i]n a typical escrow arrangement, where the escrowee has possession of collateral as agent for both the secured party and the debtor, the debtor's relationship to the escrowee is not such as to constitute retention of possession by the debtor." Id. (emphasis added).
Under these principals, the secured party is considered to have possession of collateral in an escrow when that person is the agent of the secured party, and is neither the debtor nor a person intimately connected with the debtor. The key to the agency analysis is whether the arrangement "protects the reliance interests of third parties dealing with the debtor and whether it serves the function of the possession exception in giving notice to the world that the secured party may have an interest in the collateral." Hawkland, et al., 9B Uniform CommercialCode Series § 9-313:3 at 9-169 (May, 2001).
The parties have focused their analysis on § 9-313(c), which provides:
 ". . . a secured party takes possession of collateral in the possession of a person other than the debtor [or] the secured party. . . when:
 (1) The person in possession authenticates a record acknowledging that it holds possession of the collateral for the secured party's benefit; or
 (2) The person takes possession of the collateral after having authenticated a record acknowledging that it will hold possession of collateral for the secured party's benefit." Section 9-313(c).
This subsection provides a means for a secured party to obtain perfection by possession even in cases where the possessor would not be considered an agent of the secured party. If that person authenticates a record acknowledging possession for the benefit of the secured party, then it constitutes possession by the secured party. Section 313(c) serves as a safety measure for parties to use when it is uncertain whether the person in possession would be deemed an agent of the secured party:
 "In some cases, it may be uncertain whether a person who has possession of collateral is an agent of the secured party or a non-agent bailee. Under those circumstances, prudence might suggest that the secured party obtain the person's acknowledgment to avoid litigation and ensure perfection by possession regardless of how the relationship between the secured part[y] and the person is characterized." Section 9-313, Off. Com. 4.
The parties offer conflicting positions as to whether the Registry holds the funds "for the benefit" of Gamma. The Court need not decide whether the paperwork in this case contains a sufficient acknowledgement under § 9-313(c), because it finds that the Registry escrow arrangement made the Court the equivalent of an "agent" of Gamma for purposes of determining possession.[21] Therefore, Gamma had a perfected security interest.
In making its determination, the Court is guided by its opinion that no reasonable third party, in deciding whether to loan funds to Mixitforme, would rely on the availability of the Registry funds as collateral to secure any future obligation of Mixitforme. While it is somewhat unusual to conclude that the Court constitutes an agent of a party before it, even if only for purposes of possession, it is the proper conclusion. The Registry funds clearly were not in Mixitforme's possession, and could not be expended except by order of this Court. Further, that order would not be forthcoming until the litigation concluded and the rights to the funds were established. Any party aware of the existence of the Registry escrow, through the exercise of reasonable diligence, would see from the Stipulated Order that the funds were subject to Gamma's claims. Therefore, the deposit of funds into the Registry adequately serves the purpose of "provid[ing] notice to prospective third party creditors that the debtor no longer has unfettered use of [his] collateral." See In re O.P.M. Leasing Services,Inc., 46 B.R. 661, 670 (Bankr. D.N.Y. 1985). Therefore, the Court finds that Gamma has a perfected security interest.
BRI and the Receiver also argue that the Registry funds are sufficiently similar to an attachment of Mixitforme's assets, and that because any attachment is dissolved by operation of § 10-5-42, this Court should not give effect to the Registry escrow. That statute provides:
 "An attachment of property, on any original writ or writ of mesne process hereafter issued, shall be dissolved by the appointment by the superior court of a permanent receiver to take possession of the property to be attached, if the complaint praying for the appointment of the receiver is filed in the superior court within four (4) months after the attachment was made, unless the court, in its discretion, and on due notice, shall order that the right under the attachment shall be preserved by the receiver for the benefit of the estate in receivership." Section 10-5-42.
The Receiver has argued that a failure to dissolve the Registry escrow would cause a race-to-the-courthouse among creditors, because such creditors would seek the creation of such escrows in lieu of an attachment. Of course, the effect of such a holding is not as clear as the Receiver states. If the Court were to dissolve the Registry escrow here, those devices might become less useful as a means for resolving contested disputes over possession between creditors and debtors. Moreover, it is not clear where the Receiver's argument ends. Should the Court also unwind all voluntary payments or grants of security interests if they fall within four months of a receivership, in a manner akin to a bankruptcy trustee's power to avoid preference s? Even if the Court agreed with the policies articulated by the Receiver, it cannot re-write the statute. The statute applies only to attachments, and the deposit into the Registry was not an attachment. It was the consensual[22]
creation of an escrow under order of this Court, which constituted a security interest under the UCC, but not an attachment. If the legislature sees fit to include such escrows in the ambit of § 10-5-42
it may do so, but this Court will not.
Perfection of BRI's Security Interest, as Proceeds, in the RegistryEscrow
The Court has concluded that Gamma has the superior claim to the Registry funds. However, if it turns out that Gamma' s claims do not exhaust the full amount of the Registry funds, BRI and the Receiver will have competing claims to the remaining funds. While further development of facts may render the following analysis unnecessary, the Court will analyze the competing claims of the Receiver and BRI to any remaining Registry funds.
Having already determined that BRI has a security interest in Mixitforme's escrow rights, as proceeds of the deposit account, the Court must determine whether or not BRI's security interest remains a perfected interest. This is a significant question because, as noted above, if BRI's interest is unperfected, it will be subordinate to the Receiver's rights as a lien creditor. See §§ 9-102(52)(iv), 9-317(a)(2).
BRI argued that it had a security interest in the Registry funds and that they are "identifiable cash proceeds." Therefore, it argues that its security interest remained perfected following the payment to Duffy, and the subsequent payment to the Court registry. See § 9-315(d)(2) (providing that a perfected security interest in proceeds will become unperfected after 20 days, unless the proceeds are "identifiable cash proceeds"). Cash proceeds are "money, checks, deposit accounts, or the like." § 9-102(9).[23] The Court has determined that BRI's security interest does not extend to the registry funds, but only to Mixitforme's escrow rights. Therefore, it is not clear whether that interest constitutes "money, checks, deposit accounts, or the like." See id.
The Court need not decide that question, however, because BRI's interest would be perfected even if the proceeds are not "identifiable cash proceeds." Section 9- 315(d)(3) provides that a security interest will become unperfected unless "[t]he security interest in the proceeds is perfected other than under subsection (c) when the security interest attaches to the proceeds or within 20 days thereafter."[24]
The result of this provision is that proceeds of collateral will remain perfected if it would have constituted original collateral under the applicable security agreement. That is the case here, because BRI's security agreement covered "contract rights or rights to the payment of money." (Security Agreement ¶ I.d, Ex. A to BRI's Mem. Obj to Gamma Mot., Aug. 1, 2006.) Therefore, the security interest would have attached to the escrow rights when those rights came into existence, pursuant to the Security Agreement, see § 9-203 (providing for attachment), and that interest would have been perfected by the previous filing of a financing statement covering rights to payment.See §§ 9-308(a), 9- 310(a) (providing for perfection by filing a financing statement). Without deciding which method of perfection applies to BRI's escrow rights, the Court finds that BRI has a perfected interest in the escrow rights.
Disposition of the Registry Funds
Having determined that Gamma has a perfected security interest in the Registry funds, and that BRI has a perfected security interest in Mixitforme's escrow rights, the Court must now consider the effect of those determinations. Although Gamma has adequately demonstrated that it has a security interest in the Registry funds, it has not yet proven the validity of the claims underlying that security interest. Those claims are based upon allegations that Mixitforme failed to deliver goods for which the parties had contracted, and appear to be in dispute. Gamma has not demonstrated to this Court that its security interest entitles it to payment of the Registry funds at this time, before any claim has been reduced to judgment. Until those claims are conclusively determined, the Court will not authorize the payment of funds to Gamma.
To the extent that any funds remain in the Registry following the payment of Gamma's claims, Mixitforme would have had a right to the repayment of any remaining Registry funds. BRI has a perfected security interest in that right. Since the undisputed affidavits indicate that BRI's outstanding loan s greatly exceed the amount of the Registry funds, it is clear that no funds will remain for the receivership estate.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court will deny the various motions of the Receiver. The Court will defer its decision on the Gamma and BRI motions, however, pending further proceedings relating to the underlying claims of Gamma.
Prevailing counsel may present an order consistent herewith to the Court, after due notice to counsel of record.
[1] Super. R. Civ. P. Rule 67 provides for the deposit of funds, and anything capable of delivery, into the Registry pending the results of litigation. "Such funds shall be deposited in a savings account or accounts in some mutual savings bank or banks, or a savings or participation account or accounts in a commercial bank or trust company in the name of the Registry of the Superior Court for the county." Rule 67(b).
[2] See Ex. E to BRI's Mem. Opp. To Gamma Mot., Aug. 1, 2006 (containing a copy of Duffy's check drawn on Citizens and payable to the Registry.)
[3] It appears that this check included other funds in addition to the $289,841 from the BRI deposit account. BRI contends, and it appears undisputed, that the $289,841 deposit account funds are traceable to the Registry escrow account.
[4] "Title 6A shall be known and may be cited as the Uniform Commercial Code." G.L. 1956 § 6A-1-101; see § 6A-9-101 ("This chapter may be cited as `Uniform Commercial Code — Secured Transactions'). For the rest of this decision, sections of the UCC will be cited only by article and section number, i.e. § 9-332.
[5] Perfection can loosely be described as the means by which non-parties to a security agreement are notified of the existence of that security interest. Whether or not a security interest can be perfected by possession, filing a financing statement, or by obtaining control depends on the type of collateral. BRI filed a financing statement which was effective to perfect its interest in the other types of specified collateral, but perfection of a deposit account may be accomplished only by obtaining control. See § 9-312(b)(1).
[6] The cashier's check purchased by Mixitforme was proceeds because it was "acquired upon the disposition of" the BRI deposit account.See § 9-102(64)(i). When it was cashed, Citizens "collected" funds "on account of" that check, so those funds were proceeds of the proceeds.See id. § 9-102(64)(ii). Similarly, the funds transferred to the Registry were proceeds of the proceeds of the proceeds. When the Registry cashed Duffy's check with the Registry's bank, Citizen s transferred the funds to that bank, who "acquired" those funds on the "exchange" or "disposition" of the proceeds. See id. § 9-102(64)(i).
[7] "A transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party." Section 9-332(a) (emphasis added). The italicized text illustrates the difference in the subsections of § 9-332. Money is defined as "a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by agreement between two (2) or more nations." Section 1-201(24). Conversely, a deposit account is "a demand, time, savings, passbook, or similar account maintained with a bank. The term does not include investment property or accounts evidenced by an instrument." Section 9-102(29).
[8] "Deposit account" is defined by Article 9 as "a demand, time, savings, passbook, or similar account maintained with a bank. The term does not include investment property or accounts evidenced by an instrument." § 9-102(29). Bank deposit relationships are governed by UCC Article 4, §§ 6A-4-101 to 6A-4-505.
[9] To illustrate this, assume that instead of shifting electronic credits between banks, Bank A had instead given a large bag of cash to Bank B for Bank B to hold on Debtor's behalf. That bag of cash would not be subject to the security interest, under either § 9-332(b) or the analogous provision for money, § 9-332(a). Therefore, Bank A could not seek return of that bag of cash from Bank B or any transferee of that cash. However, Debtor's rights to the deposit account at Bank B are still proceeds of Bank A's collateral and are not "funds from a deposit account." Debtor obtained a right to withdraw an amount of funds from Bank B in an amount equal to the bag of cash. Therefore, the security interest attaches to the Debtor's deposit account rights with Bank B.
[10] See § 3-104 (defining cashier's check as "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank).
[11] Bank A will presumably hold those funds until it is time to pay the recipient of the cashier's check.
[12] In this case at bar, BRI is the equivalent of both Bank A and the Lender in the Official Comments, although this need not be the case and does not change the analysis. Mixitforme's deposit account with BRI (as Bank A) could have been subject to the security interest of, say, Sovereign Bank (as Lender). If that were the case, the funds debited by BRI would not be subject to the security interest of Sovereign.
[13] Because they were "acquired upon the sale, lease, license, exchange, or other disposition of collateral," the cashier's check and the deposit account rights would be proceeds to which § 9-332(b) does not apply. See § 9-102(64)(i) (defining proceeds); see § 9-332(b), Off. Com 2., Example 2 and explanation above.
[14] As noted above, the Registry must hold the funds "in a savings account or accounts in some mutual savings bank or banks, or a savings or participation account or accounts in a commercial bank or trust company in the name of the Registry of the Superior Court for the county." Super. R. Civ. P. Rule 67.
[15] The Court chooses a casino as its example because it is a transfer for which the transferor receives nothing of value in return which would be proceeds of the collateral. Other examples might be the Clerk of the Court giving "bonus" checks to all court employees, gifts, or spending the money on goods which are then consumed.
[16] It appears undisputed that Mixitforme, the debtor, had rights in the collateral so that it could transfer the funds from a deposit account under its agreement with BRI. See § 9-104(b) (noting that a secured party has "control" of a deposit account even if the debtor has the right to direct the disposition of the funds). In addition, it appears undisputed that the signature of Mixitforme's counsel was sufficient to authenticate the agreement — although whether the Stipulated Order was a security agreement remains in dispute. Finally, the parties have not contested, and the Court agrees, that Gamma's withdrawal of its request for the appointment of a Receiver would constitute the giving of value in exchange for the conveyance of any security interest.
[17] Of course, this dispute is a prime example of how careful drafting can avoid future litigation. The phrases "security interest" and "security agreement"are not "magic words." Hillman on CommercialLoan Documentation, 10-2. "You can obtain the same rights without using them, but it is somewhat silly not to do so, since they have statutorily defined meanings, make prima facie sense to the layman, and are short."Id.
[18] "[A] secured party may perfect a security interest in tangible negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral." Section 9-313(a) (emphasis added).
[19] Money is defined by the UCC as "a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by agreement between two (2) or more nations." Section 1-201(24). It is not clear whether funds held in an escrow account actually are "money" within the meaning of the code. Compare Vienna Park Props. v.United Postal Sav. Ass'n (In re Vienna Park Props.), 976 F.2d 106,116-117 (2d Cir. 1992) (assignment of escrow rights was not money and required filing statement to perfect) with In re O.P.M. LeasingServices, Inc., 46 B.R. 661, 670 (Bankr. D.N.Y. 1985) (funds held by escrow agent were money even though deposited in a bank account).
[20] If the security interest in the check was perfected, the security interest in the Registry funds remained perfected as identifiable cash collateral. Sections 9-315(d)(2), 9-102(9).
[21] That the Registry holds the funds in a bank does not defeat possession. See § 9-313(h)(2) (providing that "[a] secured party having possession of collateral does not relinquish possession by delivering the collateral to a person other than the debtor. . . if the person was instructed before the delivery or is instructed contemporaneously with the delivery. . . [t]o redeliver the collateral to the secured party").
[22] Though the parties consented to the creation of the Registry escrow, the Court notes that such an arrangement is only permitted by leave of the Court. Super. R. Civ. P. Rule 67(a).
[23] Proceeds are identifiable "to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this chapter with respect to commingled property of the type involved." Section 9-315(b)(2).
[24] Section 9-315(c) states that "[a] security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected."